# WENGER & ARLIA, ESQS.
## ATTORNEYS AT LAW
20 Vesey Street, Suite 210
New York, NY 10007
Tel: (212) 566-6262 – Fax: (212) 608-6262

February 12, 2020

Honorable Denise L. Cote
District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: **United States v. Joseph Guagliardo**
    Sentencing Memorandum

Dear Judge Cote:

    The import of the instant sentencing memorandum is to evince mitigating factors related to Joseph Guagliardo's criminal conduct. Although Mr. Guagliardo truthfully and openly accepted his criminal responsibility for diverting over $400,000 of the Municipal Credit Union's (hereinafter, "MCU') funds to organizations controlled by him for his benefit, his criminal conduct was not governed and dominated for personal financial gain.

    To appreciate the veracity of that statement, one must be aware of Mr. Guagliardo's entire life's work as a servant of our New York City community both as a member of its law enforcement and volunteer to many of its private and public organizations. The letters annexed, and exhibits attached support that fact.

    In fact, the victim of this case, the MCU, was a beneficiary of his over 25 years of volunteering to the MCU. In quantifying the financial benefit Mr. Guagliardo provided to the MCU, (as fully detailed infra), the MCU has financially benefited well in excess of the money misappropriated. Of course, that fact does not excuse his aberrant and unacceptable criminal conduct; nevertheless, it must be expressed to inform the Court as to factors relevant to sentencing. Moreover, Mr. Guagliardo's misguided intent and motivation was, in large part, to financially benefit a true philanthropic organization, National Council of Columbia Associations in Civil Service (hereinafter, "National Council") (in excess of $200,000 which remained continuously deposited with the National Council from its initial remittance by the MCU).

    To date, the full amount of ill-gotten gains, totaling $425,514.00, has been remitted to the US Marshall's Office, Southern District of New York by and through Mr. Guagliardo's recent efforts. (Annexed hereto and made a part hereof are the balance payments by bank checks dated February 11, 2020 payable to US Marshall's Office). Furthermore, the defense will petition the United States Department of Justice for the restoration of those funds to the MCU, as and for restitution. Additionally, there is over $20,000.00 in a frozen MCU account linked to Mr.

1

Guagliardo, which the defense may logistically turn over to the MCU in the event the restoration petition falls shorts of the Court ordered restitution amount.

As the Court is aware, the foundation of our penal system lies upon three cornerstones: (1) Rehabilitation of the offender; (2) Retribution to society and to the offender's victim(s); and (3) Deterrence both upon the individual offender (to prevent recidivism) and to society as a whole. Those goals have and will be achieved without an incarceratory sentence for Mr. Guagliardo. A non-incarceratory sentence is sufficient to achieve those goals, but not greater than necessary. Incarceration for Mr. Guagliardo, would be a more uniquely severe punishment, given his current medical and psychological conditions and due to the fact that he is a former police officer and corrections officer, addressed in detail infra. As to retribution and deterrence, the consequences of this media intensive matter he has faced speaks loudly to the public at large, that corruption at any level will destroy your reputation as a civic-minded and decent person, will bring embarrassment and dishonor to your family and will strip you of your identity as, and passion for, being a public servant.

Mr. Guagliardo has been a life-long volunteer to our New York City community. According to his friend, Mr. Santos, Esq., "Joe" is a "family man…a steadfast professional…[and] a man of character and respect." He came from an unstable home, with an alcoholic, abusive father, trapped in the organized crime-ridden neighborhood of Red Hook, Brooklyn. Growing up, he suffered from many physical and psychological ailments, including anxiety, depression and attention deficit disorder (ADD), which were not formally diagnosed until later in his adult life. In spite of these obstacles, Mr. Guagliardo is an example of person that turned to education, not only to improve himself, but to give back to the community with the fruits of his education. For example, he became a public servant, beginning with his career as a corrections officer and then as a decorated NYPD officer, devoting his life to helping others and protecting his community. Even after his forced retirement due to disability, Mr. Guagliardo did not allow that to stand in his way of giving back to his community. His dedication to the MCU became his new sense of purpose in life. For instance, after September 11, 2001, Mr. Guagliardo helped formulate a counterterrorism report (one that would have cost the MCU tens of thousands to outsource) to protect the MCU from any act of sabotage or physical violence that may have come upon its institution or its workers. His volunteer position, as Chief Internal Auditor from the years 2005–2006—one that would come to save the MCU over $150,000 per year—gave Mr. Guagliardo the opportunity to feel useful. The MCU gave Joseph purpose with his 25 years of volunteerism, as well as the ability to help those in need, the stability of a community of volunteers, and even saved him from his suicidal tendencies.

**Kam Wong's Criminal Conduct**

The defense would be remiss not to include a brief discussion of Kam Wong's criminal conduct and its connection to Mr. Guagliardo's case. As the probation report detailed, Kam Wong plead guilty to embezzling over $9,000,000 from the MCU. The Government's continued investigation revealed that Wong personally sanctioned, encouraged and approved the diversion of MCU funds to the organizations controlled by Mr. Guagliardo. The defense submits Mr. Wong deliberately did same, to place Mr. Guagliardo in a compromising position and to prevent his arguably eventual "whistle-blowing" as a member of the MCU's Supervisory Committee. Again, the statement is not meant to be an excuse for his aberrant and unacceptable criminal conduct, but to inform the Court that Mr. Guagliardo indeed "took the bait" as many in the MCU

had done, including but not limited to its members of the Board of Directors. Nevertheless, Mr. Guagliardo adamantly denies knowing that Wong was stealing from the MCU. Their respective convictions are connected but do not establish Mr. Guagliardo knew of Mr. Wong's embezzlement. As Mr. Guagliardo stated, "If I knew he stole millions from the MCU I would have collared him myself. Up until he pled guilty, I believed in his innocence and supported him as if he were innocent."

Clearly, Mr. Wong and Mr. Guagliardo intentionally diverted funds from the MCU. However, the circumstances of their conduct and character of both men diverge dramatically from that common point. In the interest of brevity and a finer focus upon Mr. Guagliardo's mitigating factors for sentencing, the defense will no longer discuss Kam Wong and his criminality. However, in the event the Court wishes the defense to expound upon same, the defense is prepared to do so at sentencing, if requested by the Court.

The question now remains why did Joseph Guagliardo, a man that dedicated 25 years of his life to volunteer for the MCU, knowingly divert improper, inflated and excessive payments from the MCU? Especially because Mr. Guagliardo credits the MCU with giving him purpose in life and "saving his life" as a then recently forced to retire disabled officer.

The defense submits that good people fall from grace. Kam Wong dangled the "proverbial apple" and Mr. Guagliardo bit. Nevertheless, his life should not and will not be defined by this isolated, unacceptable criminal conduct.

**Familial Background**

Joseph Guagliardo (to correct the error of immigration officials, his last name was legally changed to its proper spelling from "Gagliardo") was born in Queens, NY on June 24, 1957. He moved with his family to Red Hook, Brooklyn when he was 4-years-old. His mother, Marie Helen DeSano, was a homemaker and worked for the New York Public Library. Currently his mother lives in a long-term care facility in the state of Oregon. His father, Joseph Gagliardo, was a laborer and long-shore man; however, was a physically abusive alcoholic. His father passed away in 2008 from mesothelioma. Mr. Joseph Guagliardo has two brothers: an older brother, Anthony Gagliardo, born in November of 1955; and a younger brother, Paul Gagliardo, born in November of 1963. His older brother, a recovering substance abuser, is now gainfully employed as a social worker in Oregon. His younger brother, who is living in Levitown, unfortunately was addicted to opiates the last time they met a few years back, and, as a result, they are currently estranged from one another.

On June 22, 1989, Joe and his then girlfriend, Joann Catalano, had a son, Nicholas Gagliardo. Today, Nicholas lives in Florida and is employed as a large cable installer throughout the United States. On February 13, 1991, Joe and Joann had another child—a daughter Jennifer ("Jenny") Gagliardo. Today, she works as a Dental Assistant, lives with her boyfriend, Kyle Criss, and, as of the date of this report, 13 weeks pregnant with her first child—and Joe's first grandchild.

On August 14, 1993, Joe married Dr. Hilary Baldwin, a Dermatologist originally from the Upper Westside of Manhattan. Together, they have twin girls, Isabella Rose and Emma Elisabeth, born on October 26, 2001. Isabella attends Roger Williams University in Rhode Island, and Emma attends Curry College in Massachusetts. Despite their desire to address the Court, both Dr. Baldwin and Mr. Guagliardo decided to exclude them from this process. Describing the relationship with his daughters, Dr. DeSano stated in the annexed letter to the

Court: "I did not think a man could love his daughter more than I, but his girls are his life. He cherishes them and teaches them and gives them experiences that only a loving father can do. This is even more special having grown up with an abusive father." Aside from his own children, Mr. Guagliardo served and continues to serve as a role model for various family friends, including, for example, Amanda Melendez. Ms. Melendez met Mr. Guagliardo over 30 years ago and calls him an "amazing role model." The two have stayed closely connected over the years and have maintained a father-daughter relationship, as detailed in her letter of support to the Court.

**Public Service Career**

Mr. Guagliardo's public service career ironically initiated from the "wrong-side" of the law. On June 23, 1975, Mr. Guagliardo was arrested in Staten Island for burglary—which began when Mr. Guagliardo entered a home to intervene on a friend's behalf pertaining to a "street beef". The incident ended with him in the hospital in handcuffs with a head injury. It was just one day before his 18th birthday. Mr. Guagliardo was taken under the gracious wing of the late Judge Vito J. Titone, (he rose to highest court seat in New York, Judge of the Court of Appeals) who sentenced him as a youthful offender and to five years of community service—all of which Joseph dutifully served out. Joseph credits Judge Titone with helping him to get his life back on track and kept his vow to Judge Titone to use his mind and skills to always give back to his community.

"My life revolves around volunteerism, and it only doubled after my retirement from law enforcement in 1989," Mr. Guagliardo explained. The beginning of his life-time of service to his community started when he took his civil service test in the early 1980s and volunteered as a board member for a program then named "Reorganization of Antipoverty Funding" (whose mission was to distribute funding to underprivileged NYC communities) (known today as DYCD/CAB). Soon after, he co-founded the Jules D. Michaels Daycare Center—an institution that is still in service today (taken over by Lutheran Hospital in 2000). Over 22 years, Mr. Guagliardo held various volunteer positions within that institution. Some of the pilot programs he started included a program to give children access to computers; a daycare program; and a program to pick up children from homeless shelters and feed them hot meals. In all, the Center greatly benefited and continues to benefit the community. It was never about the awards, trophies or money; it was about giving back to a community that had helped Mr. Guagliardo turn his life around.

As Mr. Guagliardo's cousin, Anthony DeSano explained, "He dedicated his life to helping others and not just on paper. I am talking about real life. Showing up at your door when you needed a ride to the hospital for chemotherapy kind of dedication." Ms. Colette Napoli explained, "He is one of those individuals that truly make the world a better place. His sense of loyalty, honor, and respect always amazes me. Even in situations where people have wronged him, he holds himself with dignity and integrity. He is also the most selfless person I have ever met." According to his cousin, Mr. James DeSano, Joseph is the type of person who "forgets no one's birthday." In the words of his dear friend, Ms. Campione, "Taking him away from the community will hinder the future good he could do."

Joseph Ponzi, retired Chief Investigator of the Kings County District Attorney's Office, explained, "Throughout the law enforcement community Joseph Guagliardo enjoys a reputation as a fiercely loyal and dedicated friend who can be called upon at any time to render aid and

support to those in need." Mr. Ponzi respects Mr. Guagliardo as a "devoted family man and loyal friend who has spent a lifetime helping people in need." Like dozens of his family members and friends who have written heartfelt letters, Mr. Ponzi describes these charges as "inconsistent with his construction and character." He believes Mr. Guagliardo learned a valuable lesson, suffered greatly as a result of the charges, and deserves leniency in light of his "lifetime of honorable deeds and law-abiding behavior."

Ed Ranieri, retired Transit Police Officer, recalled his years of friendship with Joseph as "extraordinary." The two met in 1992 when Joseph was a Housing Police Officer and both were fighting for legislation benefits. With Joseph as the lead in the campaign to the City Council, the officers were able to finally secure benefits in 1998. Ever since then, Joseph and Ed Ranieri have been close friends. In 2013, Mr. Ranieri fell ill—he could not speak or walk or hear. The doctors could not figure out what was wrong with him. Joe helped to transfer Ed to NY Presbyterian Hospital (Columbia University Medical Center), where doctors eventually diagnosed him with primary brain lymphoma—a rare cancer. As he underwent treatment in a new clinical trial program, Joseph was at his bedside every minute. Ed explained, "Joe was there all the time. I would wake up from treatment and there he was. It was surprising to ever find that he wasn't there when I woke up. He would get in touch with my wife and drive her back and forth to the hospital to visit me. Joe is just a super guy. There's no one like him." Today, Ed is miraculously cancer free and says he would move mountains to help Joseph if he could. He will be forever grateful for what he did for him during his diagnosis and treatment.

**Service in Law Enforcement**

Mr. Guagliardo began his career in law enforcement as a Brooklyn Public Library Security Guard. In 1980, he became a junior auxiliary police officer at the 76th precinct and then as an auxiliary police officer, while taking courses at John Jay College. From 1981 to 1982 he served as a New York City Corrections Officer. He then entered the NYPD academy on January 26, 1982 and served as a NYC Housing Police Officer from 1982 to 1989, until he was forced to retire due to a work-related disability. As a Housing Officer, he spent most of his time in the "anti-crime unit" responding to "crime conditions" in various public housing locations. Moreover, he worked on building bridges between the local precincts and the prosecutors' offices and championed the concept of diversity.

During his tenure as police officer, Mr. Guagliardo touched many lives. One of the many noteworthy cases handled by Mr. Guagliardo dealt with a young woman who was raped and assaulted at age 12 by a motorcycle gang. Once made aware of the assault, then-Officer Guagliardo worked closely with the Queens Sex Crimes Division and the Queens District Attorney's office.[1] At trial a year later, in front of Judge Leahy, then-Officer Guagliardo helped the child through the unbearable experience of testifying against her abusers. Moreover, then-Officer Guagliardo testified for several days during the prosecution's case-in-chief. As a result, the head of the gang was imprisoned, as was his wife, making her one of the first females in New York to be convicted of rape.[2] Mr. Guagliardo kept in contact with the young woman, eventually offering her an administrative position at the MCU.

---

[1] Then-Officer Guagliardo assisted in the raid of the gang's headquarters.
[2] In total, six defendants were convicted, and eight victims, many under the age of 16, got justice for their assaults.

**Education Used for Benefit of Others**

  Mr. Guagliardo had a rough up-bringing, (actually living on the rough streets of Red Hook, Brooklyn due to a physically abusive father), plagued with a learning disability that made it increasingly hard to succeed academically. Despite the obstacles, Mr. Guagliardo was tutored by friends and eventually received his GED in 1977. He went on to take courses in Government and Public Administration at John Jay College, earning up to 98 credits. He left John Jay College in 1989 due to the lack of accessibility (i.e. resources for his learning disability, travel difficulties) and transferred to St. Francis College, finishing with a Bachelor of Arts in Political Science in 1991. In 1995, he majored in Instructional Practice in Special Education at Columbia University, Teacher's College and received a Master of Education degree in 2000.[3] There, he was inducted into the Kappa Delta Pi, National Honor Society. Since then, Mr. Guagliardo has been committed to taking continuing education courses, all in an effort to give back to our NYC community.[4] For example, he received a Banking Certification from the London Business School, Credit Union Executives Society Directors Leadership Institute in 2001; a certificate for attending the Advanced Leadership Institute at Harvard Business School in 2005; a certificate in Finance from ESADE in Barcelona, Spain in 2008; a certificate in Not-For-Profit-Management from Columbia University Graduate School of Business in 2011; a certificate in the Wharton ASIS Program for Security Executives from the Wharton School in University of Pennsylvania in 2014; a certificate for attending Oxford Programme on Negotiation at the University of Oxford Business School in 2005; a certificate for attending the Global Fraud Trends at John Jay College in 2014; a certificate for attending the Fraud Conference: The Fabric of a Fraud Investigation at Pace University in 2017; and a certificate for attending the Investigations 2015 Conference at John Jay College.

Mr. Guagliardo has also received (See attached):
- Pilot's License in 1988
- Security Guard Training Certificate in 2017;
- Peer Support Officer's Training Certificate of Completion in 2006;
- Financial Crime 360 Training Certificate of Completion in 2013;
- VIRTUS: Protecting God's Children for Adults Certificate of Training Attendance in 2012;
- Credit Union Executive Society Certificate of Completion in 2006 and 2007;
- Certified Compliance & Ethics Professional Certificate of Completion in 2011;
- NYPD Citywide and National Incident Management Systems Training Certificate in 2007;
- Certified Credit Union Director Certificate in 2001;
- Point of Dispensing (POD) Core Team Operations Training Certificate in 2013; and
- Certified in Critical Incident Stress Management (CISM) in 2005

---

[3] During his years at Columbia Teacher's College, Mr. Guagliardo filed a suit against the University and the Department of Education for lack of accessible entrances and handicapped parking spaces for the disabled. He became the voice for the disabled. This suit exemplifies his dedication to a cause close to his heart. The suit was resolved in September of 1997 in which the University agreed to take measures to ensure accessibility, including building ramps, posting signs, and educating students of the services available to them.

[4] After graduating with a Master of Education in 2000, Mr. Guagliardo became a Doctoral Candidate. However, he withdrew two years later to become the primary caretaker of his twin daughters.

**Honors and Awards**
- Brooklyn Community Board 6                                                              1978-1995
- Community Development Agency, *Chairman*                                    1979-2019
- Community Development Agency, *Elected Official*                           1979-1995
- NYC Housing Police Columbia Association, *President*                       1982-1989
- Cumberland Neighborhood Family Care Center, *Board Member*       1985-1995
- NYC Health and Hospitals, *Board Member*                                           1986-1991
- Municipal Credit Union, *Chairman Audit Committee*                          1993-2007
- Conference of Presidents of the Major Italian American Associations, CEO/ *Vice Chairman*         1993-2007
- Premier Security, *Investigator-Security Specialist*                              2002-2012
- Community Mayors, Inc, *Board of Directors Member*                         2003-2014
- NYS Commission of Cemeteries, *Board Member*                                2004-2008
- Police Organization Providing Peer Assistance, *Peer Support Officer*        2005-2015
- Municipal Credit Union, *Chief Internal Auditor/ Vice President*          2005-2006
- DYCD CAB, *Chairman*                                                                          2005-2014
- Point of Dispensing (POD) Responder Program, *Volunteer*                 2013
- Municipal Credit Union, *Vice President*                                               2014-2017

On June 2, 2013, Mr. Guagliardo received recognition from the Italian government for his years of volunteerism and service to the Italian Republic.  He was knighted "Cavaliere Ordine Al Merito Della Repubblica Italiana," which is an honorary rank of the Republic ("Cav. Dott. Guagliardo").  The Order to the Merit of the Italian Republic is the first national Order for the "recognitions received for the Nation in the field of letters, arts, economics and activities with social, philanthropic, and humanitarian purposes or for services in the civil and military career."

In addition to the above-mentioned positions and recognitions, Mr. Guagliardo is also a Certified Fraud Examiner with the Association of Certified Fraud Examiners; lifetime member of the NAACP; President of the National Council of Columbia Associations of Civil Service; NYPD Support Volunteer; Certified Compliance Officer at the Society of Corporate Compliance and Ethics; NYS Certified Ombudsman (Ombudsman of the Month Award, 2018); liaison officer for the NY 10-13 Association;  Co-Founder/Executive Board Member of the Columbus Heritage Coalition; member of the Knights of Columbus; member of the Learning Disability Association of America; member of the American Behavior Institute; and lifetime member of the Civil Service Retired Employees Association.

Moreover, he has been recognized by Kappa Delta Pi, International Honor Society in Education for his Scholarship and Leadership of over 10 years of service as a society member; by the Gowanus Tenants Association in 1986 for his "untiring loyalty to the People of Gowanus Houses as a Police Officer and Civic Leader;" by the Community Action Board in 2004 in recognition of his "valuable contribution to the Community Action Program in the spirit of 'People Helping People;'" by the Office of the Police Commissioner in 2013 for his "dedicated service to the citizens of the City of NY and for [his] contributions to the Finest Police Force in the world;" and by Italian Charities of America in 2011 for his "leadership and dedication to the community and for his leadership…and commitment to the People of the State and City of New

York and for fostering unity and understanding among all nationalities and for serving the Italian American Community." Mr. Guagliardo has also been awarded the Arthur Pelo Award (dedicated after the first NYC Housing Police Officer killed in the line of duty), the highest honor of the NYPD Columbia Association.

Mr. Guagliardo is a well-respected advocate and volunteer of the Italian-American community. He is proud of his heritage and encourages others to be as well. "Most would agree that he loves and cares deeply about his Italian heritage, his friends and family," says Mr. Vincent Tummino, friend of Mr. Guagliardo for the past 20 years, as detailed in his letter of support to the Court. He explained that Mr. Guagliardo was "instrumental in the saving of the Columbus Statue in NYC" and that "his hard work and altruism has not gone unnoticed by the Italian-American community." Mr. Guagliardo has spoken at the Monument Commission hearing in Staten Island, on behalf of the Italian-American community, defending the Columbus Statue. He also spoke on a panel entitled, "Forty Years of Italian American Civil Service Employment in NYC and NY State," and at the 525th Anniversary of the arrival of Columbus in NYC.

Most notably, Mr. Guagliardo received a Proclamation from the NYC Counsel (See attached) while Chairman and CEO of the Conference of Presidents of Major Italian-American Organizations. It recognized Mr. Guagliardo for his "tireless work ethic and dedication to justice." It went on to say, "Every aspect of his life, particularly his charitable work and dedication to civic empowerment has consistently demonstrated a passion and drive for improving his community while inspiring others along the way. His generosity of time, spirit and resources has been immeasurable…he has been a powerful catalyst for positive changes and community advancements via the channeling of great actions and goals via the political avenues…he breeds gusto, sincerity and self-sacrifice in all his activities…Mr. Guagliardo is an Italian-American champion for our city who has truly excelled in his work and has earned the esteem of every New Yorker."

Mr. Guagliardo has also received a 9/11 Memorial Certificate of Appreciation from the President and CEO of the National September 11 Memorial & Museum. The certificate acknowledged Mr. Guagliardo as a "Memorial Builder" to commemorate the victims of the terrorist attacks.

**The MCU**

"While I was involved in a great deal of volunteer work, I was still lost," says Mr. Guagliardo. He was constantly searching for a replacement for the adrenaline rush and challenge that he had as a police officer. "Then, the union asked me to get involved with the MCU," he explained. In 1993, Mr. Guagliardo was interviewed by the MCU Nomination Committee. In May of that year, he began his role as a volunteer, sitting on the Supervisory Committee. When he recognized that the Committee had no real responsibility (e.g. no auditors, no policy manual, did not meet with the Department of Banking), he sought to change that. By 1994, Mr. Guagliardo wrote the policy for the Supervisory Committee and submitted the first Committee budget. Moreover, he recommended retaining outside auditors to perform internal audit functions. However, this was met with great resistance. At this point, Mr. Guagliardo recognized the blatant problems not addressed by the Board (i.e. nepotism, arbitrary salaries) due to the lack of effective auditing and believed it to be a huge reputation risk. Yet, high ranking members argued that it was not essential and was of minimal financial risk to the institution.

By 1999, Mr. Guagliardo pushed back and audited the existing board. It was the first audit ever performed by the MCU, and was unequivocally frowned upon by management, the CEO and the Board. Ironically, Mr. Guagliardo's efforts foreshadowed what was to eventually happen under the regime of Kam Wong; the increasing corruption and weakness due to the lack of oversight would permit the unbridled criminal conduct of Kam Wong. This fact is certainly not to excuse Mr. Guagliardo's aberrant behavior, but to exhibit that Mr. Guagliardo fell prey to a corrupt institution, rather than Kam Wong himself. His loyalties were always to the institution of the MCU—and correcting such weaknesses—and never to an individual. Indeed, if Mr. Guagliardo knew of the embezzlement of Kam Wong, he would have reported him (as statement above by Mr. Guagliardo in his own words). The defense is prepared to elaborate upon this point if the Court wishes same.

When Mr. Guagliardo was later elected Chairman of the Committee, he was granted access to certified regulators, annually reported to the regulators, and identified weaknesses. By then, the Committee, the Board, and the CEO had a unified working relationship, which made it easier to prepare for Y2K. During that time, Mr. Guagliardo developed a methodology to prioritize audits of Electronic Monitoring Data Processing and prepared for disaster recovery and business continuity. Furthermore, this time marked the beginning of more effective training for the Supervisory Committee. Such change was not only helpful in preparation of Y2K, it was essential for the tragedy of September 11, 2001.

During the aftermath of September 11th, the regulators relied heavily on the Supervisory Committee for guidance. Mr. Guagliardo was arranged to utilize a room at the Marriot Hotel as an "office" to hold meetings regarding business problems and disaster recovery strategies. He regularly attended meetings and acted as an independent voice for the regulators (relaying a day-by-day description of the events and decisions of management). Throughout this time, he assisted in the rebuilding of the MCU (after members resorted to stealing money from ATM machines). During this time, ATM machines became a vulnerable target and money was disappearing rapidly (about 25 million dollars was available to members in total). Rather than reporting these individual members to the prosecutor's office and filing formal charges, Mr. Guagliardo recommended the issue be handled by the Department of Investigations. As a result, approximately 6–8 million dollars was recovered without further issue.[5]

A year later, Mr. Guagliardo presented a proposal to management to apply the "spirit" of the Sarbanes Oxley to the MCU (Sarbanes Oxley did not apply to non-for-profit organizations). His recommendation was accepted and the MCU used Sarbanes Oxley's transparency clause and whistle blower policies to put permanent policies in place. Again, Mr. Guagliardo did this on a volunteer basis—he only cared about making the MCU a better and stronger institution.

By 2004, the Audit staff expanded, thereby expanding the Supervisory Committee. In 2006, Mr. Guagliardo served as the Chair of the Supervisory Committee. It was around this time that Mr. Guagliardo was able to obtain a new software, called Aftech, to assist the Audit Department. This software was intended to track much needed data on the numbers and thoroughness of the audits, giving the CEO a better understanding of the organizations strengths and weaknesses. It also set up a unique tracking system for cases. However, the Chief Internal Auditors (hereinafter, "CIA") at the time were not utilizing the software as intended,

---

[5] The MCU was able to identify members who had taken money and notified the Department of Investigations. Once contacted by the Department of Investigations, members arranged to repay the MCU. Not only were millions of dollars properly returned, the handling of the incident saved members their jobs and the city from the embarrassment of a scandal.

9

circumventing its purpose.  Instead, the CIA were falsifying audits to make it appear as though reports were being generated through Aftech.  As Chair, Mr. Guagliardo assumed the responsibilities of the CIA and ensured use of the software—a role that saved the MCU over $125,000 per year in payroll and produced better audit plans, saving millions over the years.

Around 2015, Mr. Guagliardo was heading up the Security and Fraud Department at the MCU, as a volunteer (a position that would have cost the MCU approximately $125,000 per year in payroll) (a role that he assumed for three years).  He was in charge of teaching the staff to recognize fraud, including examining checks and looking for patterns.  It was around this time that he became involved in the apprehension of an employee, named Gant, at the Co-op City branch.  Through close examination of checks, Mr. Guagliardo recognized a possible case of fraud.  He sought to open an investigation with the help of the Department of Investigations, police department and postal inspection service.  The investigation flourished, and the authorities discovered that multiple parties were involved in identity theft and other types of fraud through the misuse of security cards.  Almost $180,000 was recovered as a result.

After the Gant case, Mr. Guagliardo had become concerned due to the lack of a Chief Operating officer.  Security maintenance was non-existent, and infrastructure, hardware and upgrades were all significantly lacking.  These problems were consistently brought to the attention of regulators, to no avail.  That same year, another investigation into an assistant branch manager at the MCU, named Sabur, flourished, part in parcel, due to Mr. Guagliardo's efforts as head of the Security and Fraud Department.  Mr. Guagliardo instructed the Secruities and Fraud Department to investigate and gather footage of Sabur's activities.  As a result, Sabur was found to have misapplied loan payments into the wrong accounts at the Manhattan Branch and misused the money thereafter.  Mr. Guagliardo recommended immediate termination to the Board and CEO; however, the Board, in ignoring such recommendation, had Sabur reassigned to the Mail Banking Department.

Additionally, around 2015, Mr. Guagliardo purchased "Fiserv"—specialized fraud detection software designed to detect fraud both internally and externally.  When the program was first purchased, Mr. Guagliardo conducted extensive research on system settings and worked closely with the MCU's IT Department to specifically design the program to work with MCU's platform.  He also worked to phase out "Verafin," an outdated fraud detection software and train the Securities and Fraud Department on the new system.  According to Mr. Guagliardo, state regulators noted that Fiserv was one of the best investments made by the MCU.  Today, Fiserv is a hallmark in the banking and finance industries and continues to save the MCU millions.

With his own time and money, Mr. Guagliardo worked closely with the NYPD Counterterrorism Unit to perform inspections and develop a report for upgrades to protect the MCU from attacks, such as terrorism, active shooters, and bank robberies.  Around 2017, Mr. Guagliardo created a counterterrorism report to assess security protocols and protect the institution and its workers.  It sought to identity all the weaknesses and make much needed recommendations (this work was done voluntarily, and outside security firms estimated the cost to create such a report would have been close to $300,000).  During the time the counterterrorism report was being developed, Mr. Guagliardo and the MCU discovered a major problem with ATM machines.  Because of the MCU's failure to update the ATM machines, physically and electronically, a problem of skimming arose.  Upon physical inspections of the ATM machines, Mr. Guagliardo discovered that moldings were frequently removed, as they were not properly secured to the machine or the wall.  As a result, skimmers were able to remove the molding of the machine to install batteries, cameras, and skimming devices within the ATM.  Once an

individual inserted their card, the magnet card reader would read the credit card number and the camera would capture the individual's bank pin.  It was a gold-mine for identity theft and fraud.  Mr. Guagliardo recalls that on one instance, a skimming took around $350,000 on Jay Street from the MCU.

"Not to defend my behavior," says Mr. Guagliardo, "but I would be remiss if I did not mention that the security service performed by First One In, albeit was elementary, did eliminate the ATM skimming fraud at an immediate level."  The ATMs were checked for lose moldings and skimming devices daily.  Frequent photographs and videos were taken, memorializing the lose moldings.  Sometimes, skimmers were even physically removed and turned over.  "This was something that not even the banking world could control at the time," says Mr. Guagliardo.  Their efforts, led by Mr. Guagliardo, significantly reduced the amount of tampering with ATM machines through deterrence and increased security measures and accountability for the MCU, all while saving the MCU hundreds of thousands of dollars in stolen money. Moreover, the initial purpose of First One In was to create and develop a program that would address the issue of first responder suicides—a number that has climbed to record high in the NYPD in recent years.

## **Brief Narrative from Joseph Guagliardo**

Mr. Guagliardo was asked about his personal background and feelings regarding his criminal conduct.  The following is his response:

"Growing up, I worked a lot of odd jobs.  I worked on a paper route, then as a delivery boy at Joe's Grocery store, then as a manual laborer (laying brick working on high pressure boilers).  As far as school, I went to Catholic schools up until about the 6th grade.  St. Mary's was the last grammar school I went to around 1972.  I was also a Boy Scout and Cub scout, until my parents removed me because they were fearful I would tell someone about my father's abuse."

"I had it pretty bad when I was a kid.  My father was very abusive to my mother, brothers and me.  The cops were called to my house all the time.  I recall in 1971 they came.  I interfered trying to protect my mother and got a good beating.  My mom would often take my brothers and I to St. Paul's Episcopal Church for safe harbor and to the Brooklyn Public Library (where she worked) to sleep when my father had been drinking heavily.  Unfortunately, she always found her way back to him.  After a while, I couldn't take it anymore and wanted to leave.  My father kicked me and my brother out, so I really didn't have a choice.  I found myself living on the street in Red Hook when I was 14 years old, forced to fend for myself.  I was back and forth between friends' homes, looking for refuge.  I remember sleeping in my friend Peter Cottatella's car outside of his house for one year.  His mom was so nice and used to bring me coffee in the middle of the night to keep me warm.  When I was 15, I became my older brother's (drug) guinea pig.  He became an addict and would force me to take his drugs.  Later, my younger brother turned to drugs as well; addiction is certainly in my genes."

"In 1973, when I was 15, I thought about suicide.  I remember I was at a New Year's Eve party that year and climbed on top of the roof.  I wanted to kill myself, but I didn't.  At the time, I believe I just couldn't bear to live another day.  This incident made me realize how much I desperately needed to turn my life around and find purpose."  Without the influence of my grandmother and a psychologist from Catholic Charities, I would not have had the strength or courage to go forward; and thank God I did.

"A few weeks before I turned 18, I got arrested for burglary for breaking up a fight in someone's house. Judge Vito J. Titone saved my life and helped put me back on track by sentencing me as a Youthful Offender with the condition of community service. I knew then that I wanted to make a better life, break the cycle, and get out of the horrible situations that I was in all of my life. All I did from then on was volunteer and try to give back by educating myself and being involved in the community. I started my career in law enforcement as a Brooklyn Public Library Security Guard. Later, I became a corrections officer then joined the NYPD as a Housing officer, all while putting myself through school. I even made it to graduate with a master's degree from Columbia University Teacher's College. I married the love of my life and had twin daughters. I took pride in being a stay-at-home dad. I took the girls to all my events and meetings. Everyone loved to have them around and so did I. I taught them to always be kind and honest. Both are now 18 and away at college, and I am proud of the women they have become."

"I turned my life around for the better, but I am not perfect. I have made many mistakes in my life, and like I always taught my daughters, you have to own up to your mistakes. I am remorseful for what I have done. I know that it was wrong and plead with the Court that I have been punished enough and do not need prison to rehabilitate me or deter me from ever doing this again. I am so embarrassed to face my family and friends (I hardly leave the house anymore out of fear of being judged); I have lost the trust of so many good friends from over the years, had certain licenses revoked, and will forever suffer from being considered a convicted felon. My family needs me, especially since my wife might have to go through treatment for cancer. I can do so much good for the community, like I did all my life. I want to continue giving back to the community."

**Hilary Guagliardo**

"My name is Hilary Baldwin Guagliardo and I am Joseph's wife. We have been married for 28 years and have 18-year-old twin daughters. I am currently a dermatologist practicing in Brooklyn but spent the bulk of my career in academia. I was employed at SUNY Downstate Brooklyn Medical Center for 15 years, serving as the Director of Inpatient Services, Director of Dermatologic Surgery and Vice Chair of the Department of Dermatology and the Vice Chair of Department of Dermatology. I am now the Medical Director of the Acne Treatment and Research Center in Brooklyn."

"We met in 1991 when a man I was dating turned into a stalker, who threatened to kill my parents and friends if I broke up with him. My friend introduced me to Joe as someone who could help me. He managed to diffuse the situation—I never heard from the stalker again. After a few months, Joe and I had fallen in love. To the outside world, it probably looked improbable: An Upper West Side of Manhattan Doctor and a Court Street ex-cop. But, it worked. Yet, there were more than just two people in our marriage; Joe was married to me, but also to his biggest love—helping others. He left the house at all hours of the day and night to support his fellow civil servants in peril—at least once a week. Although his children always came first, if I was home, he would rush out to assist them in their time of need. He would often return home just before dawn and still be there to bring the girls to school. His heart is always in the right place."

"Nothing would stop him in his devotion to his organizations. He was relentless in his pursuit of obtaining aid and justice for his most cherished causes: women in crisis, the abused, ignored and impoverished children, the disabled, and his fellow civil servants who were injured,

depressed, suicidal or just down on their luck.  And he was relentless in his support of the MCU ("Mother MCU" as he called it) that aided the populations about which he was most concerned. He volunteered there about 20–40 hours per week on average. His job was his home."

"Joseph was a physically strong and able man disabled and forced to retire at 32 from a high-octane job that he loved.  He explained to me that upon retirement, particularly from an early retirement, many cops 'eat their guns' as they abruptly fall from a position of strength, authority and power to feeling completely useless as young, disabled men with no particular skills in the real world.  So, they look for something, anything to fill the void and occupy their time.  Alcoholism, drug abuse and suicide are all common.  Life holds little promise and despair is universal. I think Joseph did what his previous life taught him to do: help those in need. Volunteerism was all that was offered to him and he grabbed it with every ounce of his being.  It filled his time, gave him purpose, and yes, helped him to survive rather than become a statistic of a retired ex-cop."

"On a personal level, Joseph is a great dad, and has devoted himself to the care of our children.  He loved his role as a stay-at-home father when the children were younger.  He has molded them into confident, fearless women.  As a husband, he enabled my career and encouraged me to shoot for the stars.  He aided and supported me in the difficult time of the death of both my parents and my breast cancer diagnosis and treatment.[6]"

"This ordeal has been extraordinarily hard for him.  He has devoted his life to helping others and his community still needs him.  He is not done with all the good that he can do.  His daughters need him.  I need him.  He is all the family I have left, and I cannot go on without him by my side.  I ask that you please be lenient on this profoundly good human."

**Jennifer Gagliardo**

"Growing up was a very dark time for me.  I struggled mentally, physically and emotionally.  The world I grew up in was heartless and full of disappointment.  Parenting wasn't a natural instinct, rather it was an option in many families I grew up around.  My mother was a drug abuser who scammed the system and kept me from my father.  She used my name and my child support for her own benefit.  My father tried to be a dad despite her efforts to corrupt me. Joseph Guagliardo is many things: he is a fighter, supporter, best friend, and just a guy who saw something had to be done and did it!  He never needed praise or appreciation.  He left the life he was born into—one that consisted of stealing, and conning.  He broke the cycle of alcohol abuse and enabling.  He ran from the lifestyle of taking what you want for your own gain.  He was often doubted and knocked down repeatedly, but along the way there were believers who saw the great inside of him.  My father was my believer.  He is the only pure person I've ever known or had to look up to.  If it weren't for Joseph Guagliardo, not only would I probably be on my third child in an abusive relationship, selling drugs and living off the system, those around me would have grown up in the same situation.  He taught my peers and I to respect our government and believe in our justice system; never be untruthful and always keep your word.  Friends always came to me begging for help, but I had nothing to give.  I never asked, but he always listened and had it not been for his wisdom, some of those girls would be dead, including myself.  My father is my hero, not because he is my dad.  I was robbed of my childhood with him.  He never handed me anything I didn't work for.  Joseph Guagliardo has been the only positive role model I've ever had growing up.  He gives me hope that my dreams are never too big.  I'm now 28,

---

[6] Doctors are currently monitoring Mrs. Guagliardo for the possibility of breast cancer metastasis.

expecting my first child in a stable home, with a loving fiancé and a career that I truly love and see myself growing in. To hear these charges against him just kills me. But, in my heart, I believe no matter the outcome, he will stand tall and admit his fault because this is what he has taught me my whole life: to accept the consequences of your actions. Joseph has suffered more than you can imagine. I truly believe he has learned a lot from all of this."

**Dependents**

Joseph's wife, Hilary, relies on Joseph in all respects—whether it is helping care for their daughters, Isabella and Emma, or taking care of the house chores and bills. Currently, Hilary is undergoing the possibility of breast cancer metastasis. Since she is an only child, and lost her parents a few years ago, Joseph is all she has. He is her entire world—her whole support system. Having to undergo treatment without her husband by her side to care for her, the kids, and the household would be devastating. It would add stress to an already stressful situation and would prolong her recovery time—both of which would put an enormous strain on their daughters, who are on track to receive their college degrees in a few years.

Moreover, Joe has a sick aunt (liver and kidney issues), Judith ("Judy") Gagliardo that currently lives in Florida. She is 72 years-old and was married to Joe's father's brother. Ms. Gagliardo depends on Joe to be her advocate for her health care and to schedule doctor's appointments, when necessary. Additionally, Ms. Gagliardo has an autistic son (Joe's cousin), Evan Arnoff. He is a low-functioning adult in his 50s and currently lives in a group home in New York City. Like Ms. Gagliardo, Mr. Arnoff depends on Joe to take him to dentist appointments, psychological evaluations, annual meetings, and medical appointments. Joe is also responsible as the attorney-in-fact for Mr. Arnoff (See attached). Similarly, Joe has another disabled aunt, Thomasina Gagliardo, who lives in Florida and is deaf, and depends on him in the same way his Aunt Judy does.

**Health Conditions: Physical**

Mr. Guagliardo was forced to retire on disability from the NYPD in 1989. After his years of service in law enforcement, he continued to serve his community as part of the MCU, including during September 11, 2001. During that time, the MCU set up satellite offices at ground zero and Mr. Guagliardo volunteered his time to assess security protocols and begin to develop a counterterrorism report to protect the institution and its workers. Such report, if not developed through Mr. Guagliardo's volunteerism, would have cost the MCU approximately $300,000.

As an unfortunate consequence of his volunteerism, Mr. Guagliardo developed numerous health problems, as outlined below. He recently received a letter from Dr. John Howard, administrator of the World Trade Center Health Program, for assistance and treatment benefits for various diagnosed illnesses, annexed hereto and made a part hereof.

Back
Mr. Guagliardo developed significant back problems, specifically to his L4, L5, S1 and S2, requiring multiple painful surgeries (See, attached medical reports). His first surgery dates back to 1990, to which he received approximately 5 follow-up procedures. Recently, he has had several MRIs taken and doctors believe he may need another surgery in the future. In terms of

pain management, Mr. Guagliardo has received a series of three spinal injections in the past few years—a concoction of medications to help ease the pain—by Dr. Chapman.

Hands, Shoulder, and Knees
Mr. Guagliardo also has many problems in both hands from years of service. Specifically, he has little to no cartilage remaining by his thumbs, causing significant pain. He often wears soft casts and may be required to undergo surgery in the future. Additionally, Mr. Guagliardo suffers from a possible torn rotator cuff and weakness in his knees. His doctors have taken multiple x-rays and are considering surgery. (See, attached medical reports).

Prostate Cancer
Mr. Guagliardo has been diagnosed with prostate cancer (Malignant Neoplasm of Prostate). Currently, his doctors believe the cancer is slow metastasizing, but it will still be a tough road ahead. He remains closely monitored for any changes.[7]

Sleep Apnea
Mr. Guagliardo has been diagnosed with "severe obstructive sleep apnea" by Dr. Richard Yan—a pulmonologist. (See, attached medical reports). He requires continuous positive airway pressure to help him sleep.

Other Health Conditions
Around 2019, Mr. Guagliardo was diagnosed with eczema—a skin condition—by Dr. Shapiro. Recently, he has been made aware of three (3) other health conditions by Dr. Kymara Kung: Asthma, Chronic Rhinosinusitis (Upper Respiratory Disease), and Gastroesophageal Reflux Disease (Gerd). (See, attached medical reports). Additionally, he is being closely monitored by Dr. Paul Cohen, a gastroenterologist, because of his high risk of colon cancer.

**Health Conditions: Psychological**

Mr. Guagliardo struggled his whole life to cope with his abusive upbringing. As a boy, he lived in a toxic home environment with his physically abusive and alcoholic father. He was constantly beat as a child and even watched his father beat his mother. His cousin, Anthony DeSano, recalled: "[His father] was mostly absent but when he was around he was very abusive. There were many nights when the phone would ring, and it was Joseph's mother crying, telling my father that Joseph's father came home and hit her and punched the boys. She would show up at our door looking for protection. When Joseph's brother moved out of the house Joseph was left to take the brunt of the abuse."

In 2007, Dr. Andrew Slaby was one of the first to diagnosis and treat Joseph with a wide variety of mental illnesses—including anxiety, depression, and PTSD—stemming from his abusive upbringing. In 2008, Mr. Guagliardo joined the NYPD's Peer Mentoring program (POPPA) for professional psychological treatment (In turn, he worked tirelessly giving back to the program, helping other police officers who suffered from similar mental health conditions.) That same

---

[7] As of recent medical tests, the doctors discovered a mass in Mr. Guagliardo's lower back. They are closely monitoring the mass to ensure that the cancer has not metastasized to his spine.

year, he was diagnosed with attention deficit disorder by Dr. Vakkar.  Today, he sees psychiatrist, Dr. Barry Hozer, M.D., for treatment related to his attention deficit disorder.

**Final Words**

Joseph Guagliardo's criminal conduct is aberrant behavior—a blemish that will not define him.  As he did with many obstacles in his past, he rose from it and was better for it, as were many others.  Mr. Guagliardo has not only fully admitted to his criminal conduct, he has figuratively and literally re-paid society.  Furthermore, the goals of rehabilitation and deterrence have been and will be met with a non-incarceratory sentence.  Through this life-changing experience, Mr. Guagliardo has suffered psychologically and emotionally: the embarrassment to him and his family, the isolation from his family, friends, and beloved organizations, the loss of trust by those closest to him and the "stigma of being a convicted felon."  Additionally, he has lost licenses that form his identity; his license to carry a firearm; he has been the subject of professional ethics proceedings by the Association of Certified Fraud Examiners; has been dismissed by the Fraternal Order of Police; amongst the many revocations he faced and will face in the immediate future.

This media intensive matter has cried loudly to the public at large, that corruption at any level will destroy your life's work and career as a civic-minded son of New York City, it will shame and dishonor your family and proud heritage and will strip you of your identity as, and passion for, being a public servant.

Furthermore, the medical care in prison is wholly inadequate to deal with his vast conditions, including prostate cancer.  Joseph is a husband, a father, a friend, a mentor, and a pillar of the community—one that would suffer greatly without his continuing dedication and volunteerism.  Joseph Guagliardo has also suffered psychologically, and (as I can attest as outside criminal defense counsel for the various NYPD Law Enforcement Unions for over eighteen years) he would suffer disproportionately in prison due to his status as a former NYPD officer and corrections officer. A non-incarceratory sentence is sufficient to achieve those goals, but not greater than necessary.

___ *John Arlia* _____
John Arlia, Esq.
Wenger & Arlia, Esqs.
20 Vesey Street, Suite 210
New York, NY 10007
212-566-6262


*Exhibits Not Attached*
*Hardcopy Remitted by 1St Class Mail*

16