UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

UNITED STATES OF AMERICA                      :

     -*v.*-                                                    :          20 Cr. 23 (DLC)

JOSEPH GUAGLIARDO,                            :
  a/k/a "Joseph Gagliardo,"
                                              :
                Defendant.
                                              :
------------------------------------------------------------------x


### THE GOVERNMENT'S SENTENCING MEMORANDUM


                GEOFFREY S. BERMAN
                United States Attorney
                Southern District of New York

Eli J. Mark
Daniel C. Richenthal
Assistant United States Attorneys

Alona Katz
Special Assistant United States Attorney

- Of Counsel -

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ............................................................................................................... 2

    A. The Defendant Embezzled from and Defrauded MCU with the Assistance of Its Corrupt Former CEO ............................................................................................ 3

        *1. Overview of the Defendant's Schemes* ............................................................ 3

        *2. The Security Contract for 1st1in, Inc.* .............................................................. 5

        *3. The Advertising Payments for the National Council* ...................................... 7

        *4. Other Misconduct* ........................................................................................... 9

    B. The Defendant's Efforts to Protect Himself and Wong ............................................. 10

    C. The Charges and the Defendant's Plea ...................................................................... 12

    D. The Defendant's Post-Arrest and Post-Plea Conduct ............................................... 13

    E. The Advisory Guidelines Range ................................................................................ 16

    F. The Probation Office's Recommendation .................................................................. 17

DISCUSSION .................................................................................................................... 17

I. A Guidelines Sentence Is Warranted .............................................................................. 17

II. The Defendant's Arguments Are Unpersuasive .............................................................. 19

CONCLUSION ................................................................................................................... 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -*v.*-                                              :        20 Cr. 23 (DLC)

JOSEPH GUAGLIARDO,                          :
  a/k/a "Joseph Gagliardo,"

                                    :

                    Defendant.

                                     :
------------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Joseph Guagliardo, a/k/a "Joseph Gagliardo," is scheduled to be sentenced on June 18, 2020, at 4:00 p.m.  The Government respectfully submits this memorandum in connection with that sentencing and in response to the defendant's sentencing letter (Dkt. No. 15) ("Def. Ltr.").[1]

## PRELIMINARY STATEMENT

The defendant repeatedly abused his role as a Supervisory Committee member for Municipal Credit Union, a non-profit credit union.  Instead of being a guardian of the credit union and its members' funds, he embezzled from the institution in multiple, deliberate, and deceptive ways.  He did so for years through the complicity of the former, now imprisoned, CEO, and while providing that CEO with a stream of prescription painkillers.  And he did so not simply for purportedly philanthropic ends—as he now suggests—but for personal power and out

---

[1]     The defendant did not file all of the exhibits to his letter publicly, as the Government understands to be required by the Court's individual rules and the First Amendment and common law rights of access to judicial materials.  Defense counsel has informed the Government that he is working from home in light of the COVID-19 pandemic, and will file the remaining exhibits, with redaction as warranted, upon his return to the office.

of greed.  The credit union, which is in conservatorship after regulators identified serious and unsafe conditions, is still dealing with the damage that the defendant and others wrought.

Further, when the defendant learned that the credit union had commenced an internal investigation, he sought to frustrate that investigation, placing his loyalty to the former CEO, and concern for himself, above the institution.  He also supplied information that was inaccurate and unknown to a witness to certain of his misconduct, prior to that witness meeting with the Government.

Moreover, and consistent with his pre-arrest conduct, since his guilty plea, the defendant has sought to minimize his own conduct and the harm that he caused.

The United States Sentencing Guidelines ("Guidelines") appropriately reflect the defendant's wide-ranging, calculated, and serious betrayal of his position as an officer of a non-profit financial institution.  For what he did, the defendant faces an advisory Guidelines range of 27 to 36 months' imprisonment, as set forth in the Presentence Investigation Report ("PSR") of the United States Probation Office ("Probation Office"), in which the Probation Office recommends a sentence of 27 months.  To serve the legitimate purposes of sentencing, including promotion of respect for the law and general deterrence, the Government requests that the Court impose a sentence within the applicable Guidelines range.

## BACKGROUND

Since at least 2017, the Government has been investigating fraud, embezzlement, and corruption at Municipal Credit Union (commonly referred to as "MCU"), a non-profit, member-owned credit union based in Manhattan, including that committed by or with the knowledge of certain members at the highest echelons of the organization, and an attempted cover-up of this wrongdoing.  (PSR ¶ 8.)  The investigation revealed misconduct committed by the defendant—

who was purportedly responsible for security, detection of fraud, and oversight at the credit union—as well as by Kam Wong, the credit union's former CEO and President (who has already been convicted and sentenced), among others.[2]  The misconduct committed by the defendant and others caused significant financial and reputational harm to MCU and its members, and the institution has been placed into conservatorship because of "unsafe and unsound conditions," as described below.

### A. The Defendant Embezzled from and Defrauded MCU with the Assistance of Its Corrupt Former CEO

#### 1. Overview of the Defendant's Schemes

From in or about 1993 through May 2018, the defendant, a former law enforcement officer, served on MCU's Supervisory Committee (except for a brief period of time when he served on MCU's Board of Directors), the body charged with overseeing compliance and officers, similar to an audit committee at a for-profit company.  During this period, he also served, at times, as the head of MCU's Security and Fraud Department and as its Chief Internal Auditor (additional positions that compromised the independence of those departments (*see, e.g.*, PSR ¶ 84)).

---

[2]     On May 8, 2018, Wong was charged by complaint and arrested in connection with a wide-ranging multi-million dollar embezzlement and fraud scheme, which led to his termination on June 12, 2018.  (PSR ¶ 20.)  On or about December 2, 2018, Wong pled guilty to embezzlement from MCU and acknowledged, in his written plea agreement, to, among other things, endeavoring to obstruct and impede and obstructing and impeding the administration of justice with respect to the criminal investigation into this matter, and agreeing with one or more others to do the same.  (*Id.*)  Wong was ultimately sentenced to 66 months' imprisonment and ordered to pay more than $9 million in restitution.  (PSR ¶ 5.)

On May 24, 2018, the New York State Department of Financial Services ("DFS") discharged the entire Supervisory Committee, including the defendant.[3]  (PSR ¶¶ 15, 86.)  Then, approximately a month later, after Wong was charged with crimes, DFS discharged the entire Board of Directors, explaining that it had identified "severe deficiencies and weakness in [MCU's] internal controls and in the [Board's] oversight of the management of the affairs, funds and records of MCU, in a manner that raises significant concerns regarding the oversight of MCU's operations and protection of its membership."  (PSR ¶ 86; *see also* PSR ¶ 15.)   DFS also identified, in a separate report, that MCU was "not being run in the best interest of the membership," and money was "being used to fund excessive employee compensation and benefits."  (PSR ¶ 85.)

The defendant had played an instrumental role in assisting Wong, MCU's corrupt former CEO and President, to take control of the institution in 2007, after a struggle over succession. Shortly after Wong became MCU's CEO, the defendant began leveraging his relationship with Wong to embezzle hundreds of thousands of dollars from MCU.  (PSR ¶ 9.)  As a member of MCU's Supervisory Committee, the defendant was supposed to be a guardian and protector of MCU's funds; instead, the defendant, with the agreement and assistance of Wong, embezzled money from MCU through two of the defendant's ventures, violating both the defendant's fiduciary duty to the credit union and its members, and MCU's written conflict of interest policy prohibiting Supervisory Committee members from doing business with the institution.  (PSR ¶¶ 9, 14.)

---

[3]     The defendant refers to himself in his sentencing submission as a "decorated NYPD officer."  (Def. Ltr. 2.)  But he offers no support for the suggestion that he received any decorations from his time as an officer, and a copy of his resume listing purported distinctions, which he submitted to the credit union for re-nomination to the Supervisory Committee in or about early 2015, does not include any.

4

As described in greater detail in the PSR, in Complaint 19 Mag. 9340 (Dkt. No 1, and enclosed as Exhibit A), and as the defendant admitted in the plea agreement (enclosed as Exhibit B), his scheme took multiple forms, from causing the credit union to pay a security company he had set up; to causing the credit union to pay for wasteful advertising expenditures for a non-profit organization he controlled; to causing the credit union to pay for personal expenditures, including expensive meals at a restaurant for his organization, novelty custom badges for himself, Wong and two others, cellphone bills, and even parking tickets.  (*See, e.g.*, PSR ¶¶ 9, 60-62.)  The defendant also submitted misleading invoices and reports to the credit union, and omitted and failed to disclose his connections to people, organizations, and bank accounts to seek to cover-up what he had done and was doing.  (*See, e.g.*, PSR ¶¶ 24, 26, 34, 35.)  The improper payments were generally approved of by Wong, despite the fact that they violated MCU's conflict of interest policy. (PSR ¶¶ 9, 14.)  At the same time when Wong was enabling the defendant to bilk the credit union, the defendant was providing Wong a stream of controlled substances, in the form of prescription painkillers, including those obtained from the defendant's spouse, a doctor affiliated with a public hospital.  (PSR ¶¶ 10, 63-71.)

   2.  *The Security Contract for 1st1in, Inc.*

As noted above, as a member of the Supervisory Committee, the defendant was entrusted to protect MCU from fraud, and indeed, MCU had paid for him to pursue educational accreditations to further his compliance/security background.  But instead of applying that knowledge to help the credit union, the defendant exploited vulnerabilities MCU was

experiencing at ATMs as a pretense to create a sham company, with another person as a front, and then cause MCU to pay that company.  (*See* PSR ¶¶ 9, 17, 26-54.)[4]

      To be sure, the company did some real work for MCU, namely, certain repetitive night-time inspections of ATMs for skimmers, but that work can only be described as basic, at best. The defendant does not appear to disagree.  (*See* Def. Ltr. 11 (referring to the work as "elementary").)  As MCU explains in its victim impact statement (enclosed as Exhibit C), what the defendant had his company do "hardly were the security measures that were adequate to meet the issues at hand."  (Ex. C, at 2.)  And in any event, the defendant knew that he was not supposed to do business with or receive money from the credit union, but he did so anyway, and took multiple steps to hide what he was doing.  In August 2017, the defendant had another individual (an attorney and friend of his, who is identified as "Individual-1" in the Complaint) create a new company, 1st1in, Inc., with Individual-1 as the sole shareholder, notwithstanding that the company was the defendant's idea and would be effectively controlled by him.  (PSR ¶ 17.)  The defendant then created documents for the company, including a memorandum of understanding ("MOU"), security reports, and invoices, using Individual-1's and another's name, to obtain payments for this company, which he identified as a "consortium of trained law enforcement and security specialist [sic] with decades of service," who had been working together "since 1978."  (PSR ¶¶ 30, 34.)  That description was hyperbole—at best.  (*See* PSR ¶ 35.)  The three regular workers for 1st1in, Inc. were an old friend, a friend's son, and a family member, none of whom had a security services background and all of whom were unqualified to

---

[4]     The defendant used a report conducted by the New York City Police Department, which he had solicited, to help convince MCU to hire his company, without identifying it as his company.  That report, to which he refers in his sentencing submission, was not produced with the defendant's "money," as he asserts (Def. Ltr. 10).  The defendant did not pay for the report. Nor would it excuse his crime if he did.

perform real security services.[5]  (PSR ¶¶ 36, 40, 41; *see also* Ex. C, at 2 (the work was "conducted by unqualified personnel who were the defendant's close friends or family members").)  This scheme caused MCU to lose $256,689.  (PSR ¶ 38.)

The defendant directed the majority of the payments 1st1in, Inc. received to himself and his close family members, including for purported rent in a building he owned (that the company did not in fact use), and the purchase of a personal vehicle.  (PSR ¶¶ 17, 42-45.)  He cashed at a check casher the gross majority of the checks that he had written to himself (notwithstanding that he had a bank account, and the check casher charged fees), and he also directed money to his daughter's account at MCU, which he then withdrew in cash.  (PSR ¶¶ 44-45, 50-51.)

### 3.  The Advertising Payments for the National Council

Like many organizations, MCU made charitable contributions to other organizations. One of those was to an organization, the National Council of Columbia Associations of Civil Service, Inc. (the "National Council"), that the defendant effectively controlled, and of which he served as President.  (PSR ¶ 18.)  The defendant, in violation of MCU's written policy, solicited and received annual advertising payments for purported web advertising services on the National Council's website, which Wong approved.  (PSR ¶¶ 9, 55, 58.)  This was another means of embezzling money from MCU for the defendant's benefit, under the guise of a donation and/or advertising expenses.  Indeed, the rudimentary website barely functioned and had only one sponsor, MCU.  (PSR ¶ 57; *see also* Ex. C, at 3.)

And again, the defendant knew that what he was doing wrong, so he took steps to seek to conceal what he was doing.  Between 2008 and 2017, the defendant created letters in the name of another requesting MCU's annual sponsorship of the National Council's website for $20,000 or

---

[5]      The defendant briefly hired a fourth worker, a former member of the New York City Police Department, who quit after only a couple of weeks.

more per year.  (PSR ¶ 58.)  Not only were these advertising expenditures a violation of MCU's policy, as noted above, but they also were a waste of resources.  (PSR ¶ 59.)  In order to help to maintain MCU's sponsorship of the organization, the defendant honored an MCU representative, including Wong on multiple occasions, at a gala each year that was attended by members of MCU's Board of Directors, Supervisory Committee, and management.  (PSR ¶ 56; *see also* Ex. C, at 3.)  This scheme caused MCU to lose approximately $211,500 for the near-worthless advertising services, not including the cost of the tickets to the annual gala or MCU's purchases of advertising in the organization's journal.

The National Council appears to have been a "true philanthropic" organization (Def. Ltr. 1) only in the technical or formal sense.  The organization not only routinely failed to file annual disclosures and statements, as required for a charity, but also the majority of its funds appear to have been used for entertainment expenditures, many of which the defendant emceed and used to boost his public profile, including holiday parties, dinner dances, meals for alleged meetings, breakfasts and dinners for other organizations, golf sponsorships for other organizations, apparel, and commemorative coins.  (PSR ¶¶ 18, 19.)  According to its own records, only small amounts of money were expended on genuinely charitable endeavors, such as scholarships.  In any event, whatever the defendant's views of the National Council's alleged work, he was not permitted to embezzle money to fund that alleged work.

### 4. *Other Misconduct*

As described in the Complaint, the plea agreement, the PSR, and the victim impact statement, the defendant also defrauded, embezzled from, misdirected assets of, or otherwise harmed the credit union in other ways, including:

- Distributing hydrocodone and codeine to Wong on multiple occasions, some of which were obtained via prescriptions that the defendant had his spouse, a doctor with a public hospital, write, and some of which he obtained from another doctor affiliated with the New York City Police Department.  (PSR ¶¶ 63-76.)

- Using his MCU credit card to charge expensive meals at restaurants, including more than approximately $14,000 at a single restaurant, at least some of which were for alleged meetings the defendant hosted for his organization, the National Council.  (PSR ¶ 60.)

- Using his MCU credit card to purchase vanity custom law enforcement-type badges for himself, Wong and two others, which totaled more than approximately $2,100. (PSR ¶ 61.)

- Using his MCU credit card to pay for multiple monthly wireless phone bills (in addition to his MCU-issued cellphone), totaling more than $16,000.  (PSR ¶ 62.)

- Using his MCU credit card to pay various other purported business expenses, which were really personal expenditures, including for parking tickets and Apple iTunes purchases. (PSR ¶¶ 60, 62.)

- Demanding and receiving multiple tickets to sporting events and access to MCU's suite at MCU Park (a minor league baseball stadium) in Brooklyn, including on fifteen

occasions in 2017 alone, which he used to entertain family members and friends, while

charging meals and alcoholic beverages to the credit union.  (PSR ¶ 95.)

- Causing, without authority, MCU to enter into an "ill-advised" contract with a financial

  crime management program, while it was still using another crime management program,

  which created substantial compliance issues, and in part aided Wong's substantial theft to

  go undetected.  (*Id.*)

* * *

In sum, the credit union states:

> The ordinary MCU member deposits his or her full paycheck into
> his or her account and uses the money for basic needs: to buy food
> for his or her family; to purchase a new NYPD or FDNY uniform;
> or to pay off a loan for a necessary vehicle to travel to work. . . . It
> is clear that Mr. Guagliardo did not concern himself about ordinary
> MCU members and did not have any compunctions about
> betraying those members who were supposed to be his former
> brothers and sisters in the NYPD and FDNY (or other City
> employees). Instead, Mr. Guagliardo focused on gaining power
> and enriching himself.  In fact, Mr. Guagliardo treated the Credit
> Union like his own private fiefdom.

(Ex. C, at 5.)

### B.  The Defendant's Efforts to Protect Himself and Wong

On January 18, 2018, after law enforcement agents with the United States Attorney's

Office first questioned Wong in connection with the investigation (and Wong made false and

misleading statements regarding money he had received from MCU), the defendant reaffirmed

his fidelity to Wong, texting, "I'm always loyal to you, but people have to start responding so we

can protect ourselves from more than regulators.  This is between us."  (PSR ¶ 77.)  The

defendant meant it.  Indeed, the defendant offered to help Wong, including helping him to get

10

others to sign an affidavit on Wong's behalf, if needed.[6]  Although the Government has not identified evidence that the defendant knew at that time that Wong had embezzled from the credit union, the defendant's loyalty was clear—it was to Wong, not the credit union.

After MCU commenced an internal investigation, which resulted, on February 22, 2018, in Wong being placed on administrative leave, the defendant made efforts to attempt to impede the internal investigation.  (PSR ¶ 78, 96; *see also* Ex. C. at 4.)  For example, after Wong texted the defendant that MCU's outside counsel had "got to go," the defendant requested and attempted to commence an audit of outside counsel's bills for expenses related to the internal investigation, in an apparent attempt to hinder the internal investigation.  (PSR ¶ 78; Ex. C. at 4.) And about a week or two before the defendant was removed from his position by DFS, the defendant shredded a bag of documents outside of the area where his office at MCU was located. (PSR ¶ 79.)

After the defendant's home was searched, pursuant to a search warrant, and he learned that Individual-1 (the front man for 1st1in, Inc.) had been served with a grand jury subpoena, the defendant provided Individual-1 with information then unknown to Individual-1 concerning the formation and operation of the company.  (PSR ¶¶ 80-82.)  For example, the defendant told Individual-1, for the first time, that the defendant had set up 1st1in, Inc. after discussing the matter with MCU's General Counsel, who allegedly had suggested that the defendant form the company.  (PSR ¶ 80.)  That information was false.  (PSR ¶ 83.)  The defendant also provided Individual-1 with emails, reports, invoices, and the MOU—all of which were in Individual-1's name—and none of which Individual-1 had previously seen.  (PSR ¶ 81.)

---

[6]     One individual who signed a false and misleading affidavit for Wong was Sylvia Ash, a New York State Supreme Court justice, and former chair of MCU's Board of Directors.  Ash has been charged in Indictment 19 Cr. 780 (LAK) with obstruction of justice, and her case is pending.

Then, on August 16, 2019, a few days before Individual-1 was scheduled to meet with the Government, the defendant texted him a more than 15-paragraph long message, purporting to provide an explanation of how and why the defendant created 1st1in, Inc., the defendant's role with the company, and a justification for the payments from 1st1in, Inc. to the defendant's daughter (which, as noted above, he later withdrew from her account) and to his spouse (from whom, as noted above, the defendant obtained prescriptions for controlled substances that he gave to Wong).  (PSR ¶ 82.)

### C.  The Charges and the Defendant's Plea

On October 4, 2019, the defendant was charged in a 34-page complaint, number 19 Mag. 9340, with conspiracy to embezzle from a federally-insured credit union, embezzlement from a federally-insured credit union, conspiracy to defraud a financial institution, defrauding a financial institution, conspiracy to distribute controlled substances, and distribution of controlled substances.  (Ex. A.)

On January 10, 2020, the defendant waived indictment, and pled guilty pursuant to a written plea agreement to embezzlement from MCU.  (PSR ¶ 1.)  The defendant admitted in the plea agreement not only to embezzlement from the credit union, but also to various other misconduct, including agreeing with one or more others to embezzle from MCU; distributing and possessing with the intent to distribute hydrocodone and codeine to Wong; engaging in efforts to protect himself and Wong from scrutiny; and communicating with another individual (Individual-1) in advance of his interview by the Government and providing him with information that was unknown to him at the time and/or was inaccurate.  (*See* Ex. B; *see also* PSR ¶ 91.)

During the defendant's plea allocution, after initially admitting that he willfully misapplied and diverted money to 1st1in Inc. and the National Council, which he effectively controlled, upon questioning from the Court about whether he knew what he did was wrong, he stated, "I didn't realize it was wrong until after the fact . . . these agreements were with the CEO, and I believed them to be correct." (Plea Tr. (Dkt. No. 13) 20.)  After the Court took a brief adjournment, defense counsel explained that the defendant was confused by the Court's question, because it allegedly raised issues for the defendant about whether he knew at the time about Wong's own fraudulent conduct (even though the Court did not inquire about that).  (*Id.* at 21-22.)  The defendant then stated that he understood at the time that what he was doing was wrong, that it violated the law, and that he benefited from the payments to the two organizations, both of which he controlled.  (*Id.* at 23-24.)

### D.  The Defendant's Post-Arrest and Post-Plea Conduct

In his sentencing submission, the defendant suggests that he did not personally gain much from his scheme (Def. Ltr. 1); that his embezzlement was largely or entirely for what he perceived to be benevolent purposes (*id.*); that he always placed his loyalty to the credit union above any individual, including Wong (*id.* at 9); that he was tempted by Wong into committing his crime (*id.* at 3); that he worked to address problems at MCU that were not being properly addressed by the Board of Directors (*id.* at 8); and that he has "fully repaid" his financial penalties (*id.* at 16).  These statements are misleading or incomplete, at best.  To choose just one, obvious example, the defendant plainly personally benefited from his scheme, and undertook it, at least in large part, for that reason.  The defendant does not even attempt to reconcile his suggestion to the contrary with the checks that he cashed or the money that he directed to his daughter (and then also withdrew in cash) or his spouse.

Unfortunately, these kinds of statements are also consistent with the defendant's post-arrest and post-plea conduct.  Specifically, on January 8, 2020, after he had agreed to plead guilty and only days before his change of plea hearing, the defendant engaged in communications with a potential witness in this case (in violation of his bail conditions), in which the defendant both minimized Wong's offense and disclaimed any blame for Wong's conduct.  (PSR ¶¶ 6, 100.)  For example, he minimized the financial and other impact to MCU of his and Wong's crimes, commenting that a theft of "20 million dollars" would still be "less then [sic] ½ of 1%."  (PSR ¶ 100.)

The defendant also suggested to that same potential witness that Wong's fraud and the failure to detect it was the fault solely of the Board and regulators ignoring "warning signs" from the Supervisory Committee.  (*Id.*)  However, the defendant did not raise any contemporaneous concerns about Wong or his compensation (and obviously hid that he was feeding Wong's drug habit from anyone).[7]  To the contrary, DFS's examinations reflect that there were significant program deficiencies in areas that the defendant was purportedly responsible for operating or overseeing, such as MCU's Bank Secrecy Act/Anti-Money Laundering program.  (PSR ¶ 84.) These deficiencies escalated during the period when the defendant served in two roles, as both a Supervisory Committee member and as the head of the Security and Fraud Department, contributing to Wong being able to engage in his embezzlement scheme for years without detection.  (PSR ¶ 85; *see also* Ex. C, at 4.)

---

[7]     Perplexingly, in his sentencing submission, the defendant trumpets as one of his achievements his recommended termination of a former MCU assistant branch manager.  (Def. Ltr. 10.)   However, when that same branch manager's concerns about certain of Wong's suspicious banking activity was elevated to the defendant, he neither looked into that information nor shared that information with the Board of Directors or regulators.

Then, only approximately a week after pleading guilty, the defendant began soliciting character letters, including from law enforcement officers whom he barely knew. In his solicitation, the defendant, while acknowledging his formal guilt, suggested that he did not know at the time what he was doing was illegal and that he "did not financially benefit personally from these transactions." (PSR ¶¶ 101-03.) For example, he stated that "[t]he Southern District *believes* it was an unfair relationship," and "although I am aware of the criminal conduct for which I am now convicted, *it is a surprise to me*." (PSR ¶ 103 (emphases added).) He added, "[s]ince my actions *have been deemed illegal*," he had to take a plea, but he did not want character letters to suggest he was innocent because "*I don't want the judge to think I am speaking out of both sides of my mouth*." (PSR ¶ 104 (emphasis added).) These statements arguably conflict with the defendant's sworn plea allocution, and they certainly conflict with the facts.

The defendant similarly asserts that he "has figuratively and literally re-paid society" (Def. Ltr. 16) because he has remitted the "full amount of ill-gotten gains, totaling $425,514" to the United States Marshals Service, and he will seek to "petition the United States Department of Justice for the restoration of those funds to the MCU, as and for restitution" (*id.* at 1). Not so. As an initial matter, the defendant paid only $350,000. (PSR ¶ 176.) The Government satisfied the remainder of the defendant's forfeiture obligation through a seizure warrant of 1st1in, Inc.'s bank account (an account from which the defendant continued to write checks even after his home was searched), for which the Court has recently entered a final order of forfeiture. (*Id.*; Dkt. No. 28.) The defendant still has an independent obligation to pay restitution to MCU, which exceeds his forfeiture obligation, and his economic circumstances, as set forth in the PSR, reflect that he has ample assets to pay both (PSR ¶¶ 158, 174). But he has not done so.

As the Probation Office states, considering all of these circumstances:

> We are gravely concerned that while on bail, Guagliardo attempted to contact a witness in the case where he appeared to minimize the impact of the offense and his and Wong's role and responsibilities. Furthermore, the defendant's "blanket" solicitation of character letters, where he seemed to be "coaching" his potential references, begs the question if he is truly remorseful for his actions.

(PSR p. 41.)

The Government has the same concern.

### E.  The Advisory Guidelines Range

The Probation Office calculates the defendant's advisory Guidelines range as follows, a

calculation matching that in the plea agreement and with which the Government agrees.

- In this case, involving a violation of 18 U.S.C. § 657, the offense is governed by U.S.S.G. § 2B1.1.  (PSR ¶ 106.)

- Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level for the offense is 7, because the statutory maximum term of imprisonment is 20 years or more.  (*Id.*)

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(G), because the offense involved a loss of approximately $468,189, the base offense level is increased by 12 levels.  (PSR ¶ 107.)

- Pursuant to U.S.S.G. § 3B1.3, the offense level is increased by 2 levels, because the defendant had a fiduciary responsibility to the credit union and its members, and he abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense.  (PSR ¶ 109.)

- Pursuant to U.S.S.G. § 3E1.1(a), the offense level is decreased by two levels, because the defendant demonstrated acceptance of responsibility for the offense. (PSR ¶ 113.)

- Pursuant to U.S.S.G. § 3E1.1(b), the offense level is decreased by one additional level, because the defendant timely notified authorities of the intention to enter a plea of guilty.  (PSR ¶ 114.)

In accordance with the above, the total offense level is 18.  (PSR ¶ 115.)  The defendant

has a prior youthful offender conviction for assault, which results in no criminal history points,

resulting in a Criminal History Category of I.  (PSR ¶¶ 119, 122.)  Based upon these calculations, the defendant's advisory Guidelines range is 27-33 months' imprisonment and a fine of $10,000 to $1,000,000.  (PSR ¶¶ 164, 172.)

### F.  The Probation Office's Recommendation

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the defendant's age and background, his physical and mental health, the nature and circumstances of his offense, and the objectives of punishment, deterrence, and promotion of respect for the law, the Probation Office recommends a sentence of 27 months' imprisonment, the bottom of the applicable Guidelines range.  (PSR pp. 39, 41.)

### DISCUSSION

### I.     A Guidelines Sentence Is Warranted

The factors set forth in 18 U.S.C. § 3553(a) strongly weigh in favor of a meaningful term of imprisonment, consistent with the Guidelines and the recommendation of the Probation Office.

*First*, the seriousness of the offense warrants such a sentence.  *See* 18 U.S.C. § 3553(a)(2)(A).  As described above, the defendant embezzled hundreds of thousands of dollars from MCU, a non-profit financial institution, and placed his own interests and that of the now-former corrupt CEO above that of MCU, in a manner that caused both financial damage and non-quantifiable, but nevertheless real, harm to MCU's members, whose trust he repeatedly betrayed.

*Second*, the history and characteristics of the defendant and the nature and the circumstances of the offense warrant such a sentence.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A).  The defendant did not engage in embezzlement hesitantly or fleetingly.  He did so for years, in diverse and intricate ways, and without any apparent hesitation.  Indeed, it is apparent that he spent significant time thinking about how to conceal what he was doing, and how to keep Wong

17

happy, including through providing him with addictive drugs.  In short, the defendant had plenty

of chances to realize that what he was doing was wrong and to stop—but he did not,

notwithstanding that he is a former law enforcement officer.  The Court's sentence should reflect

this fact.  It should also reflect that the defendant engaged in other relevant misconduct, which

whether criminal or not, abused his position and hurt MCU, and that, both since his arrest and his

plea, the defendant has said things that are in tension with being truly remorseful for what he did.

*Finally*, the need for general deterrence strongly weighs in favor of such a sentence.

*See* 18 U.S.C. § 3553(a)(2)(B).  As described above, the defendant made it difficult to detect his

scheme timely or to uncover its full scope.  When such a scheme is successfully prosecuted, a

substantial sentence is warranted.  *See, e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th

Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those

offenses that either are lucrative or are difficult to detect and punish, since both attributes go to

increase the expected benefits of a crime and hence the punishment required to deter it."); *United*

*States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based

crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity,

these crimes are prime candidates for general deterrence." (internal quotation marks omitted));

*United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is

"of central concern to Congress").

The defendant's suggestion that he need not be sentenced to any prison time whatsoever

to achieve robust general deterrence (Def. Ltr. 2, 16) flies in the face of case law, logic, and

human experience.  And to the extent that this suggestion is grounded on the assertion that the

defendant has suffered "embarrassment," a "loss of trust" by others, his ability "to carry a

firearm," and is "the subject of professional ethics proceedings" (*id.* at 16), it should be rejected

out of hand.  Indeed, the approach for which the defendant appears to advocate would lead to the perverse result that sentences in those cases in which a defendant is particularly successful, pedigreed, and known within a community—while secretly taking advantage of those things to commit fraud—would be the *lowest*.

It is apparent that this defendant had connections and advantages, including with respect to education, which many—indeed, most—others who appear before the Court do not.  (*See, e.g.*, Def. Ltr. 6 (noting that the defendant has received, among other things, "a certificate in Finance from ESADE in Barcelona, Spain in 2008; a certificate in Not-For-Profit-Management from Columbia University Graduate School of Business in 2011; a certificate in the Wharton ASIS Program for Security Executives from the Wharton School in University of Pennsylvania in 2014").)  The defendant is also "a Certified Fraud Examiner."  (*Id.* at 7.)  Yet he embezzled hundreds of thousands of dollars, and engaged in fraudulent misconduct, for years, while taking steps to hide what he was doing, including by setting up a sham company.  The Court's sentence should send a message to others who may be tempted to take advantage of what and who they know to do the same.

## II.    The Defendant's Arguments Are Unpersuasive

In his sentencing submission, the defendant acknowledges that he engaged in embezzlement in multiple ways and for multiple years, but downplays the nature of his scheme and claims that, in any event, "MCU has financially benefitted well in excess of the money misappropriated."  (Def. Ltr. 1.)  Interviews of witnesses and review of MCU's records and DFS's examinations tell a very different story—of a man whose outsized role at MCU compromised the independence and objectivity of the Supervisory Committee; allowed the credit union's technology, policies, and procedures to fall behind; and then took advantage of gaps in the same systems and his personal relationship with Wong to perpetrate and cover-up multiple

19

schemes, while failing appropriately to oversee MCU and contributing to the failure to detect

Wong's years-long embezzlement. (*See* PSR ¶¶ 84-86.)

As the credit union explains:

> Mr. Guagliardo told this Court in his sentencing submission that he
> was a key player in establishing the Credit Union's systems that
> were intended to catch and prevent fraudulent activity and has set
> forth at length his purported significant investigations.  If this was
> in fact true, Kam Wong's extensive and pervasive embezzlement
> would not have gone undetected for the years and years that it did.
> Indeed, the evidence proves the opposite: Mr. Guagliardo betrayed
> his fiduciary duties to MCU and exploited the weaknesses in
> MCU's financial controls for his own financial gain and to MCU's
> detriment.  Mr. Guagliardo learned of these weaknesses in MCU's
> financial controls by serving for many years in fiduciary capacities
> on both MCU's Supervisory Committee and Board of Directors.
> In these positions, Mr. Guagliardo abused the significant power he
> had within the organization, and the knowledge of how the systems
> and procedures functioned, and used this information to his
> benefit.

(Ex. C, at 4.)

As the Probation Office aptly states, the defendant "fostered an unethical relationship

with Wong, which involved [the defendant] supplying Wong with controlled substances," which

"allowed for Wong to turn a 'blind-eye' and in turn assisted [the defendant] in carrying-out his

schemes." (PSR p. 41.)  Based on "his conduct, it appears that [his] loyalty was not to the credit

union or its members but to himself and Wong."  (*Id.*)

In addition to downplaying both what he did and how he did it, the defendant seeks a

non-incarceratory sentence on four principal grounds.  None warrants what he seeks.

*First*, he repeats that his conduct was "aberrant."  (Def. Ltr. 1, 2, 9, 16.)  If the defendant

means that he has not previously been accused of embezzlement or fraud, that is true.  But it is

equally true, as described above, that the scheme here lasted for years, and was committed in

multiple, thoughtful ways.  The defendant plainly did not simply have a momentary or solitary

lapse in judgment.  Nor, based on his conduct since his arrest and his plea, does it appear that the

defendant recognizes the gravity of what he did.

Second, he suggests that his background, and in particular, service as a law enforcement

officer, and with law enforcement, warrants significant and special leniency.  (Def. Ltr. 5, 9-10,

15.)  But while the defendant's prior service is admirable, it is apparent that he took advantage of

the trust others placed in him, at least in part as a result of his service, and related connections, to

engage in the scheme for which he stands to be sentenced.  (See Ex. C, at 2, 5.)  His prior service

does not excuse what he did—if anything, it exacerbates the impropriety of it—and it does not

warrant what he seeks.

Third, he suggests that the impact on his family warrants a non-incarceratory sentence.

(Def. Ltr. 14, 16.)  It too does not.  The argument that the defendant asks this Court to accept

could be made in virtually every case.  It is not unique to the defendant, and is at odds with

Section 3553(a), which focuses the Court's attention in imposing sentence on the defendant and

his offense, not the impact of incarceration on the defendant's family.  See, e.g., United States v.

Johnson, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the

concomitant difficulties for those who depend on the defendant, are inherent in the punishment

of incarceration."); United States v. Zadora, 93 F. App'x 305, 306-07 (2d Cir. 2004) (same); see

also Koon v. United States, 518 U.S. 81, 95 (1996) ("the defendant's family ties and

responsibilities" are a "discouraged" basis for a departure (citing U.S.S.G. § 5H1.6)).  There is

nothing about the defendant's family circumstances that merits the sentence he seeks.  On the

contrary, the defendant and his adult family members have more resources at their disposal,

which may be used to support and to visit the defendant while serving his sentence, than the

average family dealing with the incarceration of a family member.

Moreover, as described above, the defendant used his family members to commit his scheme, exposing them to potential liability, and at a minimum, awkward questions. He caused his spouse to write prescriptions for drugs to be given to Wong. He directed stolen money to both his wife and his adult daughter. And he used the same daughter's bank account to receive and withdraw crime proceeds. Having done these things, the defendant's suggestion that he should avoid a meaningful sentence on the ground that it will negatively affect his family rings hollow.

*Finally*, he describes certain physical and psychological conditions from which he suffers. (Def. Ltr. 14-16.) It is of course wholly appropriate for the Court to take these into account, but none appears unique for someone of his age, none prevented him from committing his crime (or engaging in the post-arrest and post-plea conduct described above), and all can be treated appropriately in prison, contrary to his conclusory assertion, in support of which he cites nothing, that "the medical care in prison is wholly inadequate to deal with his vast conditions" (*id.* at 16). As the Court is aware, the Federal Bureau of Prisons is well-equipped to handle all such conditions, including, if need be, in a Federal Medical Center (although the defendant's conditions appear both stable and manageable).

**CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court

impose a sentence within the applicable Guidelines range, a sentence that is sufficient but not

greater than necessary to serve the legitimate purposes of sentencing.

Dated: New York, New York
       April 17, 2020

                                        Respectfully submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney

                        By:     s/ Eli J. Mark/Daniel C. Richenthal
                                Eli J. Mark
                                Daniel C.  Richenthal
                                Assistant United States Attorneys
                                (212) 637-2431/2109
                                Alona Katz
                                Special Assistant United States Attorney