# Exhibit C



**Executive Offices**
**Municipal Credit Union**
22 Cortlandt Street
New York, NY 10007-3107
(212) 238-2321
Fax (212) 479-2974

April 16, 2020

Hon. Denise Cote, U.S.D.J.
U.S. District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY  10007

Re:   *United States v. Joseph Guagliardo*,
<u>Crim. No.1:20-cr-0023-DLC</u>

Dear Judge Cote:

The Municipal Credit Union ("MCU" or the "Credit Union") submits this letter for the Court's consideration during the upcoming sentencing of Joseph Guagliardo, former member of MCU's Supervisory Committee[1] ("Mr. Guagliardo" or the "defendant").  Mr. Guagliardo's sentencing currently is scheduled for Thursday, June 18, 2020.

Mindful that this Court is obligated under 18 U.S.C. § 3553(a) to craft a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of the law, and, in doing so, should consider "the nature and circumstances of the offense" and "the history and characteristics of the defendant," the Credit Union would like to provide the Court with additional details on the defendant's relationship with MCU and the extent to which he has victimized the Credit Union, an entity to which he claims to have been so incredibly dedicated.  The facts set forth below reveal the defendant's true wide-ranging criminal actions and belie his self-serving claims.

First, some background on MCU: MCU is New York State's oldest credit union, is chartered by New York State, and is federally insured by the National Credit Union Administration ("NCUA").  MCU has approximately sixteen (16) branches located in New York City, Yonkers, and on Long Island with approximately 500,000 members (*i.e.*, depositors).  MCU has been serving the financial needs of its members since 1916.  The Credit Union was created with the mission of providing City employees with a way to save money at reasonable rates, and offers low-cost borrowing alternatives to its members.  MCU's employees are dedicated to providing competitive products, reasonable rates, and services that truly invest and give back to the communities served by MCU.

---

[1] A Supervisory Committee, which is made up of volunteers and established by New York State banking laws, has similar functions to an Audit Committee.

1

A credit union is owned co-operatively by its members, and MCU's core membership is made up of the hardworking municipal employees that help this great city run, including the NYPD, FDNY, Corrections Department, Department of Education, Health Department, MTA Transit, NYCHA and Sanitation Department. The defendant did not steal from a faceless corporation, but from the hundreds of thousands of New York City municipal worker members who rely on the Credit Union for their financial security, and the hundreds of New Yorkers that the Credit Union employs. The defendant did not act to improve the lives of the Credit Union's members – many of whom are police officers, teachers, firefighters, clerks, nurses, home health aides, taxi dispatchers, cemetery workers, social workers, or counselors – he sought to enrich himself and feed his ego.

On January 25, 2018, the Credit Union was shaken when it was notified by the United States Attorney for the Southern District of New York ("USAO-SDNY") of potential misconduct and fraudulent activity committed by Kam Wong ("Mr. Wong"), the then-President/Chief Executive Officer of the Credit Union. I was appointed Administrator of MCU on June 22, 2018, after the New York State Department of Financial Services ("DFS") removed both the Board of Directors and the Supervisory Committee, the latter of which Mr. Guagliardo was a long-time volunteer member. I remained Administrator until May 17, 2019, when DFS took possession of MCU and appointed the NCUA as conservator.

In my role as Administrator, I witnessed firsthand the negative impact Mr. Guagliardo's abusive behavior had on the operations of MCU and the morale of its dedicated employees. Significantly, when I arrived at the Credit Union, it quickly became clear that Mr. Guagliardo had utilized his longstanding knowledge of the Credit Union, the trust placed in him from his long-term relationship as a "volunteer", and his background in law enforcement to exploit the Credit Union's leadership, employees and fellow volunteers for his own objectives and monetary gain. It was also apparent that Mr. Guagliardo took advantage of MCU's then-culture of non-compliance to enhance his and Mr. Wong's mutual betterment.

Mr. Guagliardo admitted to two embezzlement schemes during his plea allocution before this Court. In the first scheme, Mr. Guagliardo intentionally caused MCU to engage a purported security company that he owned and controlled, 1st1in, Inc. ("1st1in"), without disclosing this relationship to the Credit Union in violation of Credit Union policy. Through his role as a Supervisory Committee member, Mr. Guagliardo learned that there were ATM security issues. Mr. Guagliardo preyed upon this weakness to falsify "security" services (conducted by unqualified personnel who were the defendant's close friends or family members). 1st1in submitted weekly "reports" to MCU, which noted, in summary fashion, any issues with conditions relevant to the "security" of ATMs, such as whether the ATM lights were working or whether the ATM was out of order. These hardly were the security measures that were adequate to meet the issues at hand. Notably, the text in the reports appears to have been copied and pasted from prior iterations, repeating the same information over and over and over again. The accompanying invoices were not based upon any discernable fair market value. Ironically, Mr. Guagliardo's involvement in the scheme was exposed when security cameras on MCU ATM's video-recorded Mr.

Guagliardo, wearing MCU-logo clothing, depositing the proceeds of his crime into his daughter's[2] MCU account.

In the second scheme, Mr. Guagliardo caused MCU to make large payments to a non-profit organization of which he was the President, The National Council of Columbia Association ("National Council"). Mr. Guagliardo caused the Credit Union to provide him with $20,000 a year for the National Council's website – a barely functioning website that only featured MCU as a sponsor, and which, simply put, was a scam. To keep the funds flowing from MCU to the National Council, each year Mr. Guagliardo chose a member of MCU's management team – including Mr. Wong on two occasions – to be honored at the National Council's annual gala event. As a result, MCU was the chief financial supporter of National Council's gala, year after year. Mr. Guagliardo's claims in his sentencing memorandum that his "misguided intent and motivation was, in large part, to financially benefit a true philanthropic organization," demonstrate that he has a true lack of remorse for this multi-year scheme.

In addition to the two embezzlement schemes that Mr. Guagliardo admitted to, MCU has identified three other embezzlement schemes where Mr. Guagliardo victimized the Credit Union that are not part of the Government's plea deal with Mr. Guagliardo, causing MCU almost $1.1 million total in losses. These schemes involved other diversions of MCU's assets for Mr. Guagliardo's personal benefit and pet not-for-profit causes. Additionally, to repair the defendant's wrongs, MCU was forced to engage outside lawyers, vendors and consultants to correct the questionable policies, procedures and practices created and overseen by Mr. Guagliardo, costing the Credit Union significant additional financial expenditures on top of the losses sustained by Mr. Guagliardo's crimes. It is simply disingenuous for Mr. Guagliardo to claim that "MCU has financially benefited well in excess of the money misappropriated," in his sentencing memorandum to the Court.

The embezzlement schemes set forth above do not count the value of the several electronic devices and tickets to sporting events that Mr. Guagliardo and his family members received from Mr. Wong in exchange for Mr. Guagliardo coordinating Mr. Wong's access to illegal prescription medication. Based on electronic communications sent and received by Mr. Guagliardo, which were reviewed during MCU's internal investigation, it is clear that Mr. Guagliardo provided Mr. Wong with prescription medicines that were not prescribed to Mr. Wong on a regular basis over at least a four-year period. Mr. Guagliardo also provided Mr. Wong with prescription medication prescribed, among others, by Mr. Guagliardo's wife, who was not Mr. Wong's physician. Further, Mr. Guagliardo acknowledged in text messages that certain transmissions of such prescription drugs to Mr. Wong would be tantamount to criminal behavior. Mr. Guagliardo failed to properly exercise his statutory fiduciary duties as a member of the Supervisory Committee, as he failed to alert the Board of Directors and federal and state regulators about Mr. Wong's use of prescription medication and his distribution of prescription medication to Mr. Wong.

---

[2] Notably, Mr. Guagliardo failed to disclose this particular daughter on any of his mandatory MCU Insider Identification Forms, which are conflict of interest disclosure forms mandated by DFS, while he did disclose his twin daughters.

Aside from his embezzlement of MCU's funds, Mr. Guagliardo further victimized the Credit Union in other ways.  *First*, of significant concern to MCU, and despite Mr. Guagliardo's self-serving statements to the contrary, Mr. Guagliardo conspired to cover-up Mr. Wong's misconduct – actions that are the opposite of what would be expected from an individual who was a member of the Credit Union's Supervisory Committee and a retired law enforcement officer.

As soon as the USAO-SDNY contacted Mr. Wong, based on his text messages with Mr. Wong, Mr. Guagliardo attempted to obstruct the federal law enforcement investigation undertaken by USAO-SDNY (including sending text messages boasting about his ability to have inside information due to his prior connections with law enforcement, and his ability to use that inside information to prevent the investigation into Mr. Wong from moving forward). He further obstructed MCU's internal investigation by refusing to provide relevant documents responsive to lawfully issued subpoenas and prohibited key MCU employees from participating in the internal investigation. Mr. Guagliardo threatened outside counsel conducting the internal investigation, and even retained a third-party accounting firm to audit the invoices of that outside law firm in a desperate attempt to stop the internal investigation from uncovering MCU's deep-seeded problems and his complicity.

*Second,* the manner in which Mr. Guagliardo "volunteered" at the Credit Union demonstrates that the members were not his primary concern; instead, he focused on how he could enrich himself and garner power and control over MCU.  For example, in 2015, Mr. Guagliardo seized control of MCU's Security and Fraud Department.  Rather than assisting MCU, Mr. Guagliardo used his position at the helm of the Security and Fraud Department to enact his personal agenda – an agenda that was not in the best interest of MCU. Shockingly, and without remorse, Mr. Guagliardo claims in his sentencing memorandum to have saved MCU money by his improper actions; yet, MCU is still recovering from Mr. Guagliardo's tenure as a "volunteer."

Mr. Guagliardo told this Court in his sentencing submission that he was a key player in establishing the Credit Union's systems that were intended to catch and prevent fraudulent activity and has set forth at length his purported significant investigations.  If this was in fact true, Kam Wong's extensive and pervasive embezzlement would not have gone undetected for the years and years that it did.   Indeed, the evidence proves the opposite: Mr. Guagliardo betrayed his fiduciary duties to MCU and exploited the weaknesses in MCU's financial controls for his own financial gain and to MCU's detriment.  Mr. Guagliardo learned of these weaknesses in MCU's financial controls by serving for many years in fiduciary capacities on both MCU's Supervisory Committee and Board of Directors.   In these positions, Mr. Guagliardo abused the significant power he had within the organization, and the knowledge of how the systems and procedures functioned, and used this information to his benefit.

I am shocked by the number of employees that become visibly shaken when asked about some of the activity that occurred during Mr. Guagliardo's terms on the Board of Directors, and Supervisory Committee as well as his tenure as the self-proclaimed head of MCU's Security and Fraud Department.  Numerous MCU employees confided in me about their

interactions with Mr. Guagliardo during the years he "volunteered" at the Credit Union. All uniformly related the same theme: day after day, Mr. Guagliardo conducted himself as a bully – using his physical prowess as well as his background in law enforcement to oppress those who dared to speak up to him, and using his connections with current members of law enforcement and law enforcement organizations as a weapon.

Indeed, I found during my tenure at MCU that many employees feared Mr. Guagliardo – a fear so great that Credit Union employees reported worries of being terminated if they asked any questions, or raised any disagreement with his always strongly-held positions. Employees related to me that Mr. Guagliardo used his position of power within the Credit Union to interrogate employees, sent hostile emails to intimidate those who dared stand up to him, and even attempted to falsely accuse MCU employees of improprieties as part of the power games he played to keep his influence strong. Mr. Guagliardo operated under a system of currying favors and cultivating power and took advantage of that power in his role at the Credit Union.

Furthermore, despite his characterization in his sentencing submission, during his tenure at the Credit Union, Mr. Guagliardo failed to value compliance, ethics and morals. Instead, he rewarded those who kept their heads down and did not raise concerns about his conduct, Mr. Wong's criminal conduct, or any other financial or administrative irregularities at the Credit Union. One of the most crucial functions of the Credit Union's Supervisory Committee was to oversee the Credit Union's internal audit department – with a concentration on keeping the institution safe and sound. Yet, upon my arrival, I found a weak and ineffective internal audit department that focused on pleasing the Supervisory Committee members rather than the well-being of the institution. I also found a corresponding lack of a culture of compliance throughout the entire organization. Mr. Guagliardo played a large part in keeping that internal audit department in an ineffectual state while cultivating and enhancing this culture of non-compliance.

There is no doubt that Mr. Guagliardo's criminal wrongdoing has shaken the membership and created insecurity, emotional stress, and trauma amongst MCU's employees. Mr. Guagliardo's actions have ruined the professional careers of many others and now, almost two years since his removal by DFS from his position at MCU, continues to cause pain throughout the Credit Union. Mr. Guagliardo's crimes have hurt the trust that some employees and members feel toward the institution. The ordinary MCU member deposits his or her full paycheck into his or her account and uses the money for basic needs: to buy food for his or her family; to purchase a new NYPD or FDNY uniform; or to pay off a loan for a necessary vehicle to travel to work. MCU is proud to serve this unique segment of the banking sector that needs credit and assistance. It is clear that Mr. Guagliardo did not concern himself about ordinary MCU members and did not have any compunctions about betraying those members who were supposed to be his former brothers and sisters in the NYPD and FDNY (or other City employees). Instead, Mr. Guagliardo focused on gaining power and enriching himself. In fact, Mr. Guagliardo treated the Credit Union like his own private fiefdom. The true victims of Mr. Guagliardo's numerous crimes are MCU's members and employees.

***

While the forfeiture order entered into in this matter details $425,514 in loss, MCU estimates that the defendant's scheme of embezzlement and fraud has harmed the Credit Union in the amount of almost $1,100,000.

To fulfill the goals set forth 18 U.S.C. § 3553(a), and to achieve justice, MCU requests that the Court impose the strictest sentencing and highest restitution permitted under the law.

Please do not hesitate to contact me at any time with questions.

Very truly yours,

Stella M. Mendes
Former Administrator
Municipal Credit Union
FTI Consulting