**WENGER & ARLIA, ESQS.**
**ATTORNEYS AT LAW**
**20 Vesey Street, Suite 210**
**New York, NY 10007**
**Tel: (212) 566-6262 – Fax: (212) 608-6262**

June 22, 2020

Honorable Denise L. Cote
District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: **United States v. Joseph Guagliardo**

Dear Judge Cote:

The defendant consents to be sentenced via video-conference in the event an "in-person" sentencing cannot occur on July 23, 2020.  Moreover, the defense submits there are grounds for the Court to find "a serious harm to the interest of justice," in the event the sentencing hearing for Mr. Guagliardo does not occur in July of 2020.

Prior to the COVID-19 pandemic, Mr. Guagliardo was scheduled for sentencing on April 10, 2020.  Since its postponement, Mr. Guagliardo has been living with the uncertainty, fear, and distress of his upcoming court date; it has taken an exceptional toll on his physical and psychological well-being.  The Supreme Court of the United States has recognized, "a prolonged delay may subject the accused to an emotional stress that can be presumed to result in the ordinary person from uncertainties." **Strunk v. U.S.**, 412 U.S. 434, 439 (1973).  Moreover, the Second Circuit has recognized, "a delay in sentencing may leave the defendant, as well as the victim, in limbo concerning the consequences of conviction." **United States v. Ray**, 578 F.3d 184, 198 (2d Cir. 2009).

Mr. Guagliardo lives with the embarrassment of his friends and family continually questioning with no answer from him, when he "will be sentenced;" his twin daughters ask whether their father will be present for their graduation; his older daughter asks if her newborn baby will have her grandfather around during her formative years; as well his own anxiety due to the delay of sentencing keeping him awake at night.  Since his arrest and subsequent conviction, Mr. Guagliardo's liberties have been restricted.  Accordingly, he rarely left his home; its affect to him was as if he has been sentenced to home detention, well before the COVID-19 pandemic. He does not know whether, or when, this Court would be able to hold an in-person sentencing. Mr. Guagliardo has embraced his guilt, accepts responsibility for his actions, and wishes for the efficient finality of his case.

Much has transformed in the world since the defense filed its sentencing submission. Accordingly, the defense would like to briefly update the Court as to same and succinctly

respond to the subsequent submissions by other parties. As Your Honor is keenly aware, COVID-19 has taken a significant toll on the vast majority of New York City and people around the globe. According to the CDC and Dr. Anthony Fauci, M.D., director of the National Institutes of Health's National Institute of Allergy and Infectious Diseases, "It's so clear that the overwhelming weight of serious disease and mortality is on those who are elderly and with a serious comorbidity: heart disease, chronic lung disease, diabetes, obesity, respiratory difficulties." Mr. Guagliardo falls into this unfortunate category. He is 63 years old and suffers from, inter alia, chronic asthma, malignant prostate cancer, chronic rhinosinusitis (upper respiratory disease), morbid obesity, and sleep apnea—requiring a sterile CPAP device to breathe at night, which can easily become contaminated and transmit viruses directly to a person's lungs and airways (See attached, Medical Reports and News Articles indicating same). Mr. Guagliardo has been tested for COVID-19 antibodies, which came back negative (See attached, Lab Results indicating same). Mr. Guagliardo remains very anxious and highly vigilant when leaving his home to prevent illness.

The defendant is highly susceptible to contracting COVID-19—the major reason he and defense counsel determined that video conferencing would be the safest option. The government shutdown and extremely limited court system operation is a testament to the seriousness of COVID-19 and its transmission and contraction. Sending a man of his age and physical condition to prison during these times is surely a health risk. Aside from the extensive treatment Mr. Guagliardo would require due to his underlying conditions, he would face the unimaginable burden of trying to prevent illness among a population already highly susceptible to sickness and death. According to an article in the New York Times, the number of cases in correctional facilities has topped 70,000, making the list of the "nation's top five COVID-19 hot spots." The Coronavirus Crisis Inside Prisons Won't Stay Behind Bars, N.Y. Times (June 25, 2020), https://www.nytimes.com/2020/06/25/opinion/coronavirus-prisons-compassionate-release.html. It notes, "[O]vercrowding, unsanitary conditions, shortages of personal protective equipment (not to mention soap) and restrictions on hygiene products such as hand sanitizer have turned detention facilities into a playground for the virus and a death trap for inmates—many of whom, are at an elevated risk for complications." *See Id.*

The harsh conditions inside correctional facilities are no secret, even to judges, including U.S. District Judge Richard Sullivan. *See* Kaja Whitehouse, *Convicted murderer cries after judge allows him to see dentist* (August 1, 2017, 6:10PM), https://nypost.com/2017/08/01/convicted-murderer-cries-after-judge-allows-him-to-see-dentist/?utm_source=url_sitebuttons&utm_medium=site%20buttons&utm_campaign=site%20buttons. Most notably, U.S. District Judge Colleen Kollar-Kotelly of Washington signed an emergency order in April demanding the improvement of prison conditions, where more than 60% of inmates were subject to quarantine and more than one-quarter of its Department of Corrections staff was sent home. Spencer S. Hsu & Keith L. Alexander, *Judge orders emergency D.C. jail overhaul of medical, cleaning, 'social distancing' practices and defense lawyer access to stem coronavirus* (April 19, 2020, 4:47PM), https://www.washingtonpost.com/local/legal-issues/judge-orders-emergency-dc-jail-overhaul-of-medical-cleaning-social-distancing-practices-and-defense-lawyer-access-to-stem-coronavirus/2020/04/19/9c02e80a-8255-11ea-ae26-989cfce1c7c7_story.html. The order stemmed from a civil action, arguing that correctional facilities had been "deliberately

indifferen[t]" to inmate's health and well-being by "failing to take comprehensive, timely, and proper steps to stem the spread of the virus." *Id.* Therefore, the defense strongly urges Your Honor to consider sentencing Mr. Guagliardo to a non-incarceratory sentence so that he can monitor his conditions in a safe environment without the increased risk of contracting this deadly virus.

Lastly, as to recent submissions that Your Honor has received, the defense would like to point out that these negative, bias letters are not even merely a fraction of the positive support that Mr. Guagliardo has received over the past few months.  Please take note that defense counsel is unable to cross-examine these individuals to question their motives and allegations.  The letters rely on uncorroborated and highly partial statements.  Specifically, Mr. Gorman's letter was replete with uninformed opinions about Mr. Guagliardo.  His interpretations are nothing more than inconsequential resentment from the past.  Mr. Gorman chose to depict himself as speaking on behalf of an organization that he is no longer a member of and has inserted himself for reasons unknown to Mr. Guagliardo.  The voicemail message Mr. Gorman refers to in his letter was taken out of context.  It was in response to a message written by Mr. Gorman on social media that Mr. Guagliardo perceived as uninformed.

Similarly, MCU's victim impact statement, as well as its Sworn Proofs of Loss, detail baseless allegations regarding Mr. Guagliardo's criminal conduct.  For example, it announces a significantly higher amount of misappropriation of funds without sufficient corroboration.  It uses mere conclusory numbers and statements, whereas the defense and this Court have relied on facts throughout the duration of this case.  It also identifies purchases and trips, but fails to identify those involved and the surrounding circumstances.  Such baseless claims are not only inappropriate, they are unsupported and falsely lay blame on Mr. Guagliardo.  Lastly, the victim impact statement and Mr. Gorman's letter misconstrues Mr. Guagliardo's time as a volunteer at MCU and minimizes his accomplishments, as detailed in the prior defense mitigation/sentencing report.  These submissions falsely state as fact, Mr. Guagliardo having conspired with Mr. Wong by covering up Mr. Wong's misconduct, despite Mr. Guagliardo's repeated outright denial to the public at large (and even in his allocution before this Court) and lack of evidence thereof. Lastly, the letters erroneously attempt to portray Mr. Guagliardo as a bully, without naming his accusers or specific instances.  Overall, the defense is of the position that the victim impact statement and Mr. Gorman's letter lacks credibility and submits that the Court should treat them as such in rendering sentence upon Mr. Guagliardo.

_____
John Arlia, Esq.
Wenger & Arlia, Esqs.
20 Vesey Street, Suite 210
New York, NY 10007
212-566-6262

Re: **United States v. Joseph Guagliardo**

**Supplemental Documents**

Re: **United States v. Joseph Guagliardo**


**Medical Reports**



SUNRISE MEDICAL
LABORATORIES

| | | | |
|---|---|---|---|
| Patient Name: | GUAGLIARDO, JOSEPH | Account Number: | 20210 |
| Date of Birth (Age): | 06/24/1957 (62 years) | Account Name: | FPK Services<br>11150 S Wilcrest Dr<br>Houston, TX 77099 |
| Gender: | M | | |
| Order #: | 1324667289 | Referring Dr: | 1699795609, THU |
| Accession #: | | Collection Date/Time: | 06/22/2020 13:20 |
| Patient Phone: | (917) 670-3336 | Received Date/Time: | 06/23/2020 07:57 |

| Result Name | Abnormal | Normal | Range/Units | Lab |
|---|---|---|---|---|
| **26506 SARS-CoV-2 ANTIBODIES** | | | | |
| 26562 SARS-CoV-2 Abs Interp. | | Negative | Negative | SML |
| 26563 SARS-CoV-2 Abs Index | | 0.1 | <1.0 / COI | SML |

```
INTERPRETATIVE INFORMATION
Index (COI) Value Interpretation
< 1.0 Negative for anti-SARS-CoV-2
antibodies
> or = 1.0 Positive for anti-SARS-CoV-2
antibodies

This test is intended for the qualitative detection of antibodies to
SARS-CoV-2 in human serum and as an aid in identifying individuals
with an adaptive immune response to SARS-CoV-2, indicating recent or
prior infection. At this time, it is unknown for how long antibodies
persist following infection and to what degree the presence of
antibodies confers protective immunity. The Roche Elecsys
Anti-SARS-CoV-2 assay should not be used to diagnose acute SARS-CoV-2
infection.

Negative results do not preclude acute SARS-CoV-2 infection. If acute
infection is suspected, direct PCR testing is recommended. False
positive results may occur due to cross reactivity from pre-existing
antibodies or other possible causes. This assay has overall
sensitivity of 100% and specificity of 99.8% in patients >=14 days
post-PCR confirmation.

The Elecsys Anti-SARS-CoV-2 assay is only for use under the Food and
Drug Administration's Emergency Use Authorization (EUA) under section
564(d)(1) of the Act, 21 U.S.C section 360bb-3(b)(1) unless
authorization is terminated or revoked sooner. Testing is limited to
laboratories certified under the Clinical Laboratory Improvement
Amendments of 1988 (CLIA), 42 U.S.C 263a, to perform moderate and high
complexity tests.

Fact sheet for Healthcare Providers:
https://www.fda.gov/media/137603/download

Fact sheet for Patients:
https://www.fda.gov/media/137604/download

Fasting: Yes
All tests are performed at Sunrise Medical Laboratories unless otherwise indicated Sunrise Medical Lab
Accession No. CL1388486
```

**Paul Cohen M.D. P.C.**
Progress Note

Joseph Georgeardo

5/20/20   Wt: 330 lbs   BMI: 40

(62yo) M is s/p gastric bandy
for wt loss in 2007 for
morbid obesity, wt at the
time was 369 lbs.

Most recent EGD 7/6/20 - mod. esophagitis
- small H.H.
- erosive gastritis
- H.P. ⊖

Last wfy 4/13/20 → 1cm tubular adenoma
- Pan-Tics

Dx: ① Morbid obesity
① Repeat wfy 3yrs        ② Mod. erosive esophagitis
② Cat. GLi 44 CA        ③ small H.H.
③ Wt reduction          ④ Mild gastritis
④ Repeat 44 CA N1       ⑤ F/hx H/o CA for CA
⑤ d. Alterd             ⑥ Comfort        ✓ ✓

17 × 23 = **391**

 **‹ Back**    **After Visit Summary**

Some of this information might have changed since your visit.

Joseph Gagliardo (MRN: 11002267) (CSN: 794982024) • Printed by [ELKOWS01] at 7/8/20 10:54 AM    Page 1 of 3   *Epic*

**2 of 3**

## Your Medication List as of July 8, 2020 10:54 AM

ⓘ Always use your most recent med list.

| | |
|---|---|
| **albuterol** 90 mcg/actuation inhaler<br>Commonly known as: PROVENTIL HFA;VENTOLIN HFA | Inhale 90 Puffs into the lungs daily. |
| **aspirin** 81 mg EC tablet<br>Commonly known as: ECOTRIN | Take 1 tablet by mouth daily. Enteric Coated |
| **diazePAM** 10 mg tablet<br>Commonly known as: VALIUM | PRN as per patient on 06/22/20 |
| **furosemide** 80 mg tablet<br>Commonly known as: LASIX | Take 80 mg by mouth daily. |
| **HYDROcodone-acetaminophen** 10-325 mg per tablet<br>Commonly known as: NORCO | Take 1 tablet by mouth 3 (three) times daily. |
| **methocarbamoL** 500 mg tablet<br>Commonly known as: ROBAXIN | take 1 tablet by mouth once daily if needed |
| **methylphenidate HCl** 10 mg tablet<br>Commonly known as: RITALIN | PRN as per patient on 06/22/20 |
| **Miscellaneous Medical Supply** Misc | Custom made orthotics<br>(G57.92) Neuropathy of left foot<br>(G57.91) Neuropathy of right foot<br>(M21.6X9) Cavus foot, acquired<br>(M19.071, M19.072) Primary osteoarthritis of both feet |
| **multivitamin with minerals** tablet | Take 1 tablet by mouth daily. |
| **omeprazole** 40 mg capsule<br>Commonly known as: PriLOSEC | Take 40 mg by mouth daily. |
| **phentermine** 37.5 mg tablet<br>Commonly known as: ADIPEX-P | Take 37.5 mg by mouth daily. |
| **VYTORIN 10-10 ORAL** | Take by mouth daily. |

## ✑ Problem List

Reviewed: 7/8/2020 10:33 AM by Stuart J Elkowitz, MD

Malignant neoplasm of prostate
Primary osteoarthritis involving multiple joints
 All Assessment & Plan Notes
Class 3 severe obesity due to excess calories without serious comorbidity in adult
 All Assessment & Plan Notes
Frozen shoulder
 All Assessment & Plan Notes
Subacromial bursitis of left shoulder joint



cr-00023-DLC   Document 33   Filed 07/09/20   Pa

Back     **Past Visit**     Close



## After Visit Summary

**Joseph Gagliardo**   DoB: 6/24/1957

📅 6/23/2020 2:30 PM

📍 NYU Langone Radiology - Ambulatory Care Bay Ridge 929-455-2000

# Today's Visit

You were seen on Tuesday June 23, 2020. The following issues were addressed:

- Primary osteoarthritis involving multiple joints
- Class 3 severe obesity due to excess calories without serious comorbidity with body mass index (BMI) of 40.0 to 44.9 in adult
- Adhesive capsulitis of left shoulder
- Subacromial bursitis of left shoulder joint

# What's Next

| | | |
|---|---|---|
| JUN **30** 2020 | **Follow Up Appointment with Bruce Garner, MD** Tuesday June 30 2:15 PM Arrive 15 minutes prior to appointment. | NYU Langone Ambulatory Care Bay Ridge - Rheumatology 6740 Fourth Avenue 4th Floor BROOKLYN NY 11220 929-455-2000 |
| JUL **7** 2020 | **Ankle Brachial Index Pulse Volume Recording** Tuesday July 7 3:00 PM | NYU Langone Ambulatory Care Bay Ridge - Cardiology 6740 Fourth Avenue, #2fl BROOKLYN NY 11220 929-455-2740 |




Ordered by Bruce Garner, MD
Collected on 6/23/20
Resulted on 6/23/20

## NARRATIVE & IMPRESSION

History: Left shoulder pain. Osteoarthritis

Technique: XR SHOULDER AP AND SCAPULA Y LEFT

Comparison: None available

Electronic Signature: I personally reviewed the images and agree with this report. Final Report: Dictated by and Signed by Attending MICHAEL B. MECHLIN MD 6/23/2020 4:40 PM

IMPRESSION:

No acute fracture or dislocation. Mild left glenohumeral osteoarthrosis with left glenohumeral joint space narrowing, subchondral sclerosis and some osteophytic change inferiorly. Moderate arthrosis at the left AC joint.

## IMAGES

**Tap here to view full-resolution images.**

Final result

**ASK A QUESTION**





## 2 VW

### Ordered by Bruce Garner, MD
### Collected on 6/23/20
### Resulted on 6/23/20

## NARRATIVE & IMPRESSION

History: Osteoarthrosis

Technique: XR HAND PA AND LATERAL BILATERAL

Comparison: None available

Electronic Signature: I personally reviewed the images and agree with this report. Final Report: Dictated by  and Signed by Attending MICHAEL B. MECHLIN MD 6/23/2020 4:18 PM

IMPRESSION:

No acute fracture or dislocation. There is deformity of the right fifth metacarpal shaft related to an old healed fracture there. There is some deformity of the dorsal aspect of the base of the right second distal phalanx at the right second DIP joint which is probably due to old trauma. There is marked arthrosis at the basal joints of the thumb bilaterally.
Joint spaces are otherwise well preserved without significant narrowing, erosive, or osteophytic change.

## IMAGES

## Tap here to view full-resolution images.

◀ Mail ᵘⁱₗ 🛜     21:35     ⬩ 🔋 21% 🔋
cr-00023-DLC    Document 33    Filed 07/09/20    Pa
‹ Back



**GAGLIARDO, J.**    20063601    6/23/2020

| Logoff | Help | Scroll | Pan | Zoom | WI | Rotate | Titles | › |



ACBR
SIEMENS,
Fluorospot
Compact FD
2 mAs

GAGLIARDO, JOSEPH
11002267 M/(63Y)
Accession no.: 20063601
X HAND PA Left
Jun 23, 2020 2:33 PM
Series 3 - Image 1

L       R

Zoom: 1.00
WC: 2,322
WW: 2,376
Measurements: estimated
Presentation: Multiple, Transient


**Not for Diagnostic Use**

1/1




‹ Test Results

# Ordered by Bruce Garner, MD
## Collected on 6/23/20
## Resulted on 6/23/20

## NARRATIVE & IMPRESSION

History: Osteoarthrosis

Technique: XR KNEE AP AND LATERAL BILATERAL

Comparison: None available

Electronic Signature: I personally reviewed the images and agree with this report. Final Report: Dictated by  and Signed by Attending MICHAEL B. MECHLIN MD 6/23/2020 4:28 PM

IMPRESSION:

No acute fracture or dislocation. Mild medial femoral tibial joint space narrowing in both knees with mild tricompartmental osteophyte formation compatible with mild osteoarthrosis. There are large superior and inferior patellar enthesophytes bilaterally as well as large anterior tibial tubercle enthesophytes bilaterally. No significant effusion in either knee

## IMAGES

### Tap here to view full-resolution images.

Final result

**ASK A QUESTION**

Re: **<u>United States v. Joseph Guagliardo</u>**

**News Articles**



 

Home   About Us   Fact Sheets & Resources   Key Events   Volunteers   CPAP Directory   News   Shop   Contact Us   Membership   Donate

# Coronavirus (COVID-19) and using CPAP Treatment for Sleep Apnea

Tweet     Like     15 people like this. Sign Up to see what your friends like.

🕐 Created: Friday, 17 April 2020



Things you should know about...

## USING CPAP DURING THE COVID-19 PANDEMIC

- If you have, or may have, COVID-19 you can continue to use CPAP with some precautions
- Contaminated droplets may be spread into the air through CPAP use
- Special care in cleaning your CPAP equipment is required
- While community transmission exists use CPAP in a separate bedroom if possible
- Similar considerations apply to using non-invasive ventilators and CPAP in children

1**. Can CPAP worsen COVID-19 if I have it?**

There is no evidence to suggest continuous positive airway pressure (CPAP) therapy will worsen COVID-19 if you have it.  Positive airway pressu
commonly used in the treatment of severe lung infections.

2.    **If I have coronavirus can CPAP use transmit my infection to others?**

- *Yes, it can if precautions are not taken*.
- There are two main ways in which COVID-19 is passed from person to person. Firstly, by the spread of contaminated droplets from an infect
  airways through the air and secondly, by direct contact with contaminated people, objects or surfaces.
- Droplet spread can be increased by using positive airway pressure treatments such as CPAP. The air pressure from CPAP increases droplet p
  from the mouth and nose.
- This process is called aerosolization of secretions. Aerosolized virus particles may remain suspended in the air for an hour or more.
- Contaminated CPAP masks and tubing can also aid disease transmission through direct contact. Without cleaning, COVID-19 can persist on p
  surfaces for hours or even days.

3.    **What can I do if I have COVID-19 symptoms and use CPAP?**

- People with known or suspected COVID-19 must ensure that they are as isolated as possible from others, including while using CPAP. The
  separate bedroom if possible, with doors closed.
- If a separate bedroom is not available, you should seek advice from your doctor about alternate treatments for your obstructive sleep ap
  unwell. There are changes that can be made to your CPAP equipment to decrease the risk to others, including use of a different face mas
  However, any modification to your treatment must only be done under the direction of a skilled provider to ensure the CPAP therapy con

safely to you.  In the case of children (see below) any change should only be done under the direction of your child's sleep doctor.

○ Your CPAP equipment must be cleaned after every use and the bedroom environment kept clean, with regular disinfecting of surfaces, in... attention to the casing of your CPAP device. Before cleaning turn your device off at the plug and when wiping down make sure the cloth is... moisture getting inside and damaging internal components.

○ The mask and tubing from your CPAP equipment require special attention. Basic steps include:

- Disconnecting these from your CPAP machine.
- Disassembling your mask into its 3 parts: head straps, cushion and frame.
- Cleaning these mask parts and your tubing in mild soap and warm water.
- Rinsing them in warm water.
- Placing them on a towel on a flat surface out of direct sunlight to dry.
- Doing this after every use.

- If you have a humidifier, clean and dry the humidifier tub in the same way. When ready for use then fill it with fresh water (preferably distille...

**4.  I have no COVID-19 symptoms…. should I still take precautions when using CPAP?**

You can have COVID-19 with little or no symptoms, particularly in the first few days of infection.  Thus, if there is any risk you have been expose... may choose to sleep using your CPAP in a separate bedroom, if available, even if you have no COVID-19 symptoms.  This will reduce the chance... sleeping partner via droplet spread from CPAP if you do become infected.  Such a precaution may be wise until community spread of the infect...

**5.  What if my child has COVID-19 symptoms and is using CPAP?**

The same considerations apply. Your child should be as isolated from others as possible while using their CPAP device, as long as you are still a... treatment. Use careful handwashing after handling and washing your child's CPAP equipment.  Seek advice from your doctor about alternative... apnoea treatments if your child is unwell.  Do not stop their CPAP treatment without this advice.

**6.  What if I am using non-invasive ventilatory assistance (BiPAP, VPAP or similar devices)?**

Similar concerns apply as for CPAP.  However, your use of this type of device suggests you may have increased breathing vulnerability with infe... particularly important you seek medical advice early about your problems.  Do not stop using your equipment unless under the direction of you... increased infection risk to others when you have a respiratory infection and are using your ventilator.

If you have a disability that requires the help of carers and have suspected or confirmed COVID-19 which is being looked after at home:

- You should be cared for in one designated room.
- The room must be kept clean including regular disinfection of hard surfaces.
- The carer must use personal protective equipment including a surgical mask, special gloves and apron, and eye protection when attending t...
- The carer should minimise the time spent in your room, where safe to do so.
- Consider using mobile phones for communication with the carer rather than repeated entry into the room.
- Prohibit non-essential visits by others.

*Other Information*

See our Fact Sheet ***Getting good sleep during the COVID-19 pandemic***

**Download a printable version**

## Partners

Log in

SUBSCRIBE NOWLOG IN

ADVERTISEMENT

Opinion

# The Coronavirus Crisis Inside Prisons Won't Stay Behind Bars

Federal officials recognized the danger of the spread of coronavirus in prisons early, but have dragged their feet releasing at-risk inmates.

**By The Editorial Board**

The editorial board is a group of opinion journalists whose views are informed by expertise, research, debate and certain longstanding values. It is separate from the newsroom.

June 25, 2020

57



Calla Kessler/The New York Times

The situation inside the nation's jails and prisons amid the Covid-19 pandemic has become the stuff of nightmares. Overcrowding, unsanitary conditions, shortages of personal protective equipment (not to mention soap) and restrictions on hygiene products such as hand sanitizer have turned detention facilities into a playground for the virus and a death trap for inmates — many of whom, because of age or pre-existing conditions, are at elevated risk for complications. And the threat extends far beyond the facilities themselves, endangering the families and communities that

surround prison guards, nurses and other staff members.

Currently, the nation's top five Covid-19 hot spots are all correctional facilities, according to data collected by The Times. The number of infected inmates and workers has topped 70,000 — the count doubled between mid-May and mid-June — and there have been at least 627 virus-related deaths.

Even these infection numbers are assumed to be an undercount, since testing for the virus remains inadequate and uneven. New York State has tested only about 3 percent of its 40,000 inmates, and more than 40 percent of those tested were confirmed infected. In Mississippi, Alabama and Illinois, fewer than 2.5 percent of state prison inmates have been checked. Some states, like Texas, have moved to ramp up testing, and their reported cases are soaring. Further complicating the count, some facilities do not make their testing numbers public.

Inmates are scared and desperate, and tensions occasionally boil over. In April, more than 100 inmates at a prison in Washington State protested after six inmates tested positive for the virus, and a smaller uprising occurred at a Kansas facility after more than two dozen inmates and staffers tested positive.

ADVERTISEMENT

This disaster was not merely foreseeable, it was foreseen — at least at the federal level. On March 26, with an eye toward easing the strain on the system, Attorney General Bill Barr directed the federal Bureau of Prisons to focus on moving vulnerable inmates out of harm's way and into home confinement. This would also serve to reduce crowding and the risk of infection for those left behind.

Eight days later, Mr. Barr issued another memo declaring "emergency conditions" at several facilities hit hard by the virus, announcing that an expanded cohort of inmates should be considered for transfer and urging

officials to speed up the decarceration effort.

Thanks for reading The Times.
Subscribe to The Times

The bureau's response has been dysfunctional to the point of cruelty.

In the three months since Mr. Barr's original directive, around 4,500 inmates have been moved to home confinement — less than 3 percent of the federal inmate population. Another 500 or so have been granted compassionate release — immediate release based on special circumstances not foreseeable at the time of sentencing — according to the office of Senator Dick Durbin, Democrat of Illinois. In most of those cases, the courts ordered the release over the objections of the Justice Department.

The process has been hamstrung by policy chaos and bureaucratic sluggishness. Among other snafus, the bureau issued new, more generous eligibility guidelines in early April, then apparently rescinded them within days without a coherent explanation. This led to many inmates being cleared to go home and even placed in prerelease quarantine, only to then be informed that their release had been canceled, according to court filings. Even after the bureau moved to clarify its standards, confusion remained about which inmates were prioritized for release.

The situation grew so disturbing that, in late April, Senator Chuck Grassley, the Iowa Republican, and Mr. Durbin asked the inspector general of the Justice Department to look into whether the bureau was "fully and expeditiously" working to move people into home confinement. The inspector general has pledged to issue public reports on many of the senators' concerns once the inquiry is complete.

ADVERTISEMENT

The courts have also expressed their dismay. One Federal District Court judge in New York, in ordering the immediate release of an inmate who had been stuck in prerelease limbo, denounced the bureau's process as "Kafkaesque." The prison claimed in court that the inmate was in

"quarantine" ahead of his release. But the judge noted — and the prison didn't contest — that the inmate "remains in regular and close contact with other inmates and prison staff. … He lines up with other inmates in proximity in order to receive food and medication multiple times per day. He also shares communal spaces like toilets, sinks, and showers with dozens of other people." The prisoner was not even housed in a cell by himself; he shared one with another prisoner.

More notably, in response to a class-action suit filed by the American Civil Liberties Union on behalf of four inmates at the Elkton Federal Correctional Institution in Ohio, another federal district judge ordered officials to transfer more than 800 older, at-risk inmates out of the virus-ridden facility through compassionate release, home-confinement or transfer to other facilities. The Department of Justice appealed, and the inmates remain in limbo as the legal fight drags on and the virus continues its rampage inside Elkton.

This week, Mr. Grassley and Mr. Durbin took a small stab at rationalizing the situation with the introduction of the Covid-19 Safer Detention Act. The proposal is modest, mostly aiming to fine-tune existing laws affecting compassionate release and home confinement. It would, however, expand an existing pilot program that moves elderly inmates into home confinement, subject the bureau's decisions on such transfers to judicial review and establish vulnerability to Covid-19 as a basis for compassionate release for the duration of the pandemic.

Lawmakers are correct that the system cries out for reform. But the current crisis was born of both policy shortcomings and a widespread failure of implementation, not to mention general dysfunction. As detailed in a June report by the Marshall Project, federal prison officials have failed to protect inmates and the staff in numerous ways. (State prison systems have their own share of horror stories.) The bureau has maintained that it's doing its best in an impossible situation. But closer scrutiny is clearly merited, and perhaps stricter oversight by Congress going forward.

America's inmates have been sentenced to pay their debt to society. That debt does not include falling victim to a lethal virus because of official incompetence.

*The Times is committed to publishing a diversity of letters to the editor. We'd like to hear what you think about this or any of our articles. Here are some tips. And here's our email: letters@nytimes.com.*

*Follow The New York Times Opinion section on Facebook, Twitter (@NYTopinion) and*

# The Washington Post

*Democracy Dies in Darkness*

# Judge orders emergency D.C. jail overhaul of medical, cleaning, 'social distancing' practices and defense lawyer access to stem coronavirus

By **Spencer S. Hsu** and **Keith L. Alexander**

April 19, 2020 at 4:47 p.m. EDT

A federal judge on Sunday ordered the D.C. jail to immediately overhaul health, sanitation and social distancing measures for 1,400 prisoners in the nation's capital to combat climbing infection rates of the novel coronavirus, while stopping short of ordering further inmate releases.

---

**Support our journalism. Subscribe today.** →

---

U.S. District Judge Colleen Kollar-Kotelly of Washington acknowledged the "unprecedented challenge" facing District authorities but ruled that a lawsuit brought by the D.C. Public Defender Service and the American Civil Liberties Union's D.C. affiliate was likely to prove that corrections officials have shown a "deliberate indifference" to inmates' health "by failing to take comprehensive, timely, and proper steps to stem the spread of the virus."

In a sweeping emergency order, Kollar-Kotelly demanded that District officials improve more than a dozen medical and safety measures to protect inmates and workers, citing a climbing rate of infection that has put 60 percent of inmates under quarantine and knocked one-quarter of D.C. Department of Corrections workers out of action in the five weeks since emergency declarations were ordered.

AD

"The risks of contracting COVID-19 are very real for those both inside and outside DOC facilities," Kollar-Kotelly wrote in a 31-page opinion, referencing the disease caused by the novel coronavirus. "However, Plaintiffs have produced evidence that inadequate precautionary measures at DOC facilities have increased their risk of contracting COVID-19 and facing serious health consequences, including death.

"Given the gravity of Plaintiffs' asserted injury, as well as the permanence of death, the Court finds that Plaintiffs have satisfied the requirement of facing irreparable harm unless injunctive relief is granted."

As of Sunday, the confirmed infection rate per capita for inmates behind bars at D.C. jail facilities was 15 times that for the city's population as a whole. The infection rate for corrections employees was six times that for the population as a whole.

AD

The District reported 90 inmates had tested positive for the virus and that 880 were in isolation or quarantined with symptoms or because of suspected exposure. Among corrections personnel, 26 had tested positive and 152 were not working because they tested positive or were in quarantine. One prisoner and one worker have died of the virus, and a 59-year-old prisoner who tested positive was hospitalized.

Judge orders emergency D…overcrowded, coronavirus-beleaguered D.C…ocument activity, access is tight and dangerous - The Washington Post 6/29/20, 10:58 AM

Case 1:20-cr-00023-DLC Document 33 Filed 07/09/20 Page 27 of 33

As of Thursday, 281 out of 949 (30 percent) funded department positions were unavailable for duty, a factor court-ordered inspectors singled out as rendering D.C. jail facilities unsafe despite written government procedures in place.

"Understaffing during a crisis situation such as the COVID-19 pandemic makes it difficult to enact and enforce the necessary precautionary measures," Kollar-Kotelly wrote. "Having a written policy in place but not fully implemented cannot protect Defendants from a finding of deliberate indifference."

Kollar-Kotelly mandated immediate improvements in screening, tracking and delivering prompt medical care for those showing symptoms; keeping inmates and staff six feet apart per Centers for Disease Control and Prevention guidelines; restoring and maintaining prisoners' right of access to confidential legal calls while jail visitors are banned; and halting "punitive conditions of isolation" that she wrote make it more likely that inmates hide symptoms and infect others.

AD

Judge orders emergency D.C. ... coronavirus ... could be deadly ... so ... Document 33 ... accessed to erroneous ... Washington Post          6/29/20, 10:58 AM

In an interview, ACLU of D.C. legal director Scott Michelman said: "We're very pleased that the judge has recognized the urgency of the situation and the grave deficiencies of the D.C. jail. . . . The judge rightly found that the expert report corroborates what jail staff and detainees have been saying over the last few weeks."

J. Michael Hannon, attorney for the union that represents D.C. corrections officers, case managers and nonmanagement workers — which has filed its own lawsuit against the agency in D.C. Superior Court and a friend of the court brief in the prisoners' case — added, "We have no reason to rejoice, because DOC has persistently lied to us."

Hannon continued: "We support the inmates, because the jail leaders have engaged in conscious disregard for our safety too. And if jail officials do not work with and listen to us now, their efforts to comply with Judge Kollar-Kotelly's order will fail, just like their empty promises of the past."

AD

The office of D.C. Attorney General Karl A. Racine did not immediately respond to a request for comment.

The legal action comes as prisoner advocates nationwide have pressed local, state and federal jails and prisons to release prisoners deemed at low risk of flight or public dangerousness but at higher vulnerability of dying of the coronavirus because of age or underlying medical conditions.

Advocates call prisons "tinderboxes" for viral spread in communities — combining the risks of cruise ships and nursing homes by confining large populations of sicker and older occupants together, magnified by poor medical and sanitary conditions and high turnover or "churn" into the general public by the release of detainees charged with or sentenced of lower-level crimes, as well as the daily coming and going of big worker populations.

AD

Kollar-Kotelly's ruling relied on findings of inspectors Grace M. Lopes and Mark Jordan from three days of unannounced visits April 10-12.

Inspectors found the D.C. jail system is housing 22 percent fewer inmates than a month ago but is making "no effort to enforce" stated social distancing rules or other procedures because it has too few workers and supervisors, with one guard monitoring up to 45 prisoners.

Many inmates are using "tattered and soiled" rags made from tearing towels or T-shirts to try to clean cells and communal areas; workers and staff members are living in "fear" and uninformed about when, how and why to wear protective masks or gloves and how to use cleaning chemicals.

AD

Inmates who test positive for the virus are placed in isolation units and not permitted to shower, clean their cells, contact family or attorneys or change soiled clothes, linens or masks for the duration of the illness, inspectors said.

Kollar-Kotelly called it "critical" for jail facilities to strengthen environmental health and safety conditions by hiring a registered sanitarian, overseeing new training for inmates and workers on use of cleaning tools and protective gear, and supporting security staff members' enforcement of social distancing "on a unit-by-unit basis."



METRO

# Convicted murderer cries after judge allows him to see dentist

By Kaja Whitehouse

August 1, 2017  |  6:10pm



Shutterstock

A Bonanno soldier convicted of murder shed tears in a Manhattan federal courtroom after a judge said he could leave prison to get his teeth fixed.

Pasquale "Patty Boy" Maiorino, 57, wiped his eyes with the palms of his hands when Judge Richard Sullivan OK'd his temporary release despite concerns by prosecutors that he is a danger to society.

"Do you have concern that he's going to get out and whack somebody," Judge Sullivan asked the prosecutors.

After prosecutors said no, the judge okayed the release — citing the importance of good dental hygiene.

"Once you hit a certain age, you begin to worry about these things more," the judge said, adding that dental care is prison is "notoriously lacking."

Maiorino served 20 years for a 1981 murder before being sent back to the pen on a gun charge in 2015. His sentence in that case ended in July, but he has been detained pending sentencing on a separate extortion rap tied to reputed mob boss Pasquale "Patsy" Parrello of the Bronx.

Maiorino has requested work on a temporary bridge put on before he was imprisoned that was only expected to last a few months. His dentist has said the bridge staying in so long has likely led to tooth decay.

His open-ended release is contingent on a $1 million bond secured by $900,000 in cash and property and home detention.

FILED UNDER    **DENTISTS**, **JUDGES**, **MURDERS**, **PRISONERS**, **8/1/17**

|